[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Grendell*, Slip Opinion No. 2025-Ohio-5239.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2025-OHIO-5239

DISCIPLINARY COUNSEL *v.* GRENDELL.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as ***Disciplinary Counsel v. Grendell***, Slip Opinion No. 2025-Ohio-5239.]

*Judges—Misconduct—Violations of the Code of Judicial Conduct—No discipline imposed for violation of Jud.Cond.R. 3.2 because that rule's broad restriction on testimony and consultation with government officials is a content-based speech restriction in violation of First Amendment to United States Constitution—18-month suspension, with 12 months conditionally stayed, and immediate suspension from judicial office without pay for duration of disciplinary suspension.*

No. 2024-1409—Submitted February 13, 2025—Decided November 21, 2025.

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2022-045.

————————

DEWINE, J., authored the opinion of the court, which KENNEDY, C.J., and DETERS, HAWKINS, and SHANAHAN, JJ., joined. FISCHER, J., concurred in part and dissented in part, with an opinion joined by EDELSTEIN, J. CARLY M. EDELSTEIN, J., of the Tenth District Court of Appeals, sat for BRUNNER, J.

**DEWINE, J.**

{¶ 1} Judge Timothy J. Grendell of the Probate and Juvenile Divisions of the Geauga County Court of Common Pleas is charged with multiple violations of the Code of Judicial Conduct and Rules of Professional Conduct across three counts. A panel of the Board of Professional Conduct found by clear and convincing evidence that Judge Grendell committed the charged violations. The panel recommended that Judge Grendell be suspended from the practice of law for 18 months with six months stayed.

{¶ 2} The board adopted the panel's report and recommendation and filed it with this court. Judge Grendell raises seven objections to the board's findings of fact and conclusions of law. We have considered the board's findings and recommendation and have independently reviewed the entire record, including the testimony in this matter and the transcripts of the underlying proceedings that form the basis of the charges. Based on our review of the record, we overrule Judge Grendell's objections in part and sustain them in part. We find that Judge Grendell violated the Code of Judicial Conduct and suspend him from the practice of law in Ohio for 18 months with 12 months stayed.

{¶ 3} Each of the three counts in this case originates from a distinct set of facts. A fourth count (Count 2) was dismissed by the panel before Judge Grendell's hearing. We address the counts in the following order. Count 4 ("the legislative testimony") involves Judge Grendell's testimony at an Ohio House committee meeting. Count 3 ("the Tea Party event") concerns a presentation Judge Grendell made at a political meeting. Count 1 ("the Glasier matter") involves Judge

Grendell's handling of a difficult custody dispute that had been transferred to the juvenile division from the local domestic-relations division.

## I. COUNT 4: THE LEGISLATIVE TESTIMONY

{¶ 4} We first take up the board's conclusion that Judge Grendell violated the Code of Judicial Conduct by voluntarily testifying before a legislative committee. The board found a violation of Jud.Cond.R. 3.2, which provides in relevant part: "A judge shall not appear voluntarily at a public hearing before, or otherwise consult with, an executive or a legislative body or official," unless the testimony is "[i]n connection with matters concerning the law, the legal system, or the administration of justice" or "[i]n connection with matters about which the judge acquired knowledge or expertise in the course of the judge's judicial duties." The board also determined that Judge Grendell violated Jud.Cond.R. 1.3, which states: "A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so."

{¶ 5} "[A]s the ultimate arbiter of misconduct and sanctions in disciplinary cases, [we are] not bound by factual and legal conclusions drawn by either the panel or the board." *Disciplinary Counsel v. Kelly*, 2009-Ohio-317, ¶ 11. Rather, we are "free to exercise our independent judgment as to evidentiary weight and applicable law." *Id.* Disciplinary counsel must prove a violation of the rules by clear and convincing evidence. *Disciplinary Counsel v. Jackson*, 1998-Ohio-474, ¶ 12; Gov.Bar R. V(12)(I).

{¶ 6} We reject the board's conclusion that by testifying, Judge Grendell abused the prestige of his judicial office for his personal benefit or for the benefit of others in violation of Jud.Cond.R. 1.3. And because we conclude that Jud.Cond.R. 3.2's broad restriction on testimony and consultation with government officials regarding all but a few topics is a content-based speech restriction in violation of the First Amendment, we will not discipline Judge Grendell for violation of that provision.

## A. Facts

{¶ 7} COVID-19 and its consequences dominated policy discussions in the General Assembly in the spring of 2020. One bill that emerged was House Bill 624 ("H.B. 624"). That bill was designed to require the government to report and release additional COVID-19 statistics. According to its proponents, it would require local health officials and healthcare providers to provide more complete COVID-19 testing numbers to the Ohio Department of Health and require the department to release more detailed daily figures regarding COVID-19 testing, hospitalization, and deaths. H.B. 624's primary sponsor was Representative Diane Grendell, Judge Grendell's wife.

{¶ 8} Judge Grendell testified before the Ohio House State and Local Government Committee in favor of H.B 624. He did so voluntarily—that is, he testified without being subpoenaed. As Judge Grendell put it, he "primarily" testified in his capacity as a judge, "but also as a citizen of the state of Ohio."

{¶ 9} Judge Grendell began his testimony by identifying what he understood to be a major problem in Ohio: a lack of complete information on COVID-19. The way he saw it, the Ohio Department of Health's daily statistics "release[d] half the facts to the public, the scary half of the facts: cumulative numbers of confirmed cases, cumulative numbers of hospitalized patients, cumulative numbers of alleged or suspected COVID deaths." He testified that by releasing only the "scary half of the facts," the Department of Health contributed to an unnecessary "atmosphere of fear" that made it harder for Ohioans to return to normal life. He drew comparisons between COVID-19 and past flu outbreaks to demonstrate his point.

{¶ 10} Judge Grendell cited reports of people failing to seek or delaying medical treatment from "fear of going to the doctor." He spoke about an increase in opiate-related deaths and several instances of suicide in Geauga County. He said his court never closed during the COVID-19 outbreak, partially due to an increase

in cases as a result of the outbreak. He specifically mentioned that juvenile "unruly cases ha[d] gone up," that "mental health civil commitments ha[d] increased," and that "domestic violence cases [were] on the uptick." And Judge Grendell noted that he and some fellow common-pleas-court judges were "putting together a letter trying to remind people of their civic duty of jury duty, and assuring them that if they [came] to court to perform jury duty, their lives [would] not be placed at risk."

{¶ 11} According to Judge Grendell, H.B. 624 was a step in the right direction. He argued: "As Ohio struggles to return to normal, Ohioans need to know the current number of hospitalizations, the actual number of daily deaths, and [the] number of cases currently requiring medical treatment," and "House Bill 624 will make sure that Ohioans have ready access to all of those important facts." Judge Grendell concluded his testimony by taking a couple questions from the committee about the State's COVID-19-testing regime.

{¶ 12} In support of its conclusion that Judge Grendell abused the prestige of his judicial office to advance the interests of a family member in violation of Jud.Cond.R. 1.3, the board simply pointed to the fact that his wife—Representative Diane Grendell—was the primary sponsor of H.B. 624. It found that "there [was] no other plausible reason for [Judge Grendell] to provide the testimony he provided except to promote his own, and his wife's, personal interests." The board did not elaborate on what those personal interests might be.

{¶ 13} To support its conclusion that Judge Grendell violated Jud.Cond.R. 3.2 by testifying on a matter that did not involve the legal system, the board advanced three rationales. First, the board noted that the Ohio Judicial Conference did not include H.B. 624 in any of its biweekly newsletters or in its list of bills that it identified as impacting the judiciary. The board acknowledged that the Judicial Conference's apparent lack of interest in H.B. 624 is not dispositive, but it characterized it as strong evidence that Judge Grendell's testimony "was motivated by the personal interests and agendas of himself and his wife, rather than by

concerns about the impact of the bill on the judiciary." Second, the board called into question the accuracy of Judge Grendell's testimony. It opines that because he testified "with no quantitative data to back up his claim[s]," Judge Grendell's testimony about how COVID-19 affected the judiciary "was tenuous, at best." And third, according to the board, "less than one minute of [Judge Grendell's] 18 minute and 55 second testimony was spent talking about information related to the court." Putting these three rationales together, the board concluded that Judge Grendell's "testimony to the legislative committee was not 'in connection with matters concerning the law, the legal system, or the administration of justice.' " Board Report at ¶ 260, quoting Jud.Cond.R. 3.2.

## B. Objections

{¶ 14} Judge Grendell presents two objections to the board's findings and recommendation regarding his legislative testimony. First, he argues that imposing sanctions on him for testifying before the General Assembly would violate his right to free speech under the First Amendment to the United States Constitution and Article I, Section 11 of the Ohio Constitution. Second, he argues that his testimony did not violate Jud.Cond.R. 1.3 or 3.2. We partially agree with Judge Grendell's second argument and fully agree with his first. Because we generally dispose of cases without reaching constitutional issues if we can, *Risner v. Ohio Dept. of Natural Resources, Ohio Div. of Wildlife*, 2015-Ohio-3731, ¶ 29, we consider his arguments in reverse order.

### 1. Judge Grendell's testimony did not abuse the prestige of his office for personal or economic reasons, but it did extend beyond matters concerning the law, the legal system, and the administration of justice, and beyond matters about which he acquired knowledge or expertise in the course of his judicial duties

{¶ 15} We begin with Judge Grendell's argument that he did not violate either rule. We agree that he did not violate Jud.Cond.R. 1.3. The board's finding

6

that "there [was] no other plausible reason for [Judge Grendell] to provide the testimony he provided except to promote his own, and his wife's, personal interests" is wrong. One plausible reason for Judge Grendell to testify in support of H.B. 624 would be that he is a concerned judge and citizen and he simply thought it would be good for the State and the judiciary. Another would be that he had specific insight to share that he acquired through his work as a judge and former legislator. Both are plausible reasons based on the record in this case, despite the board's conclusory finding otherwise. And the fact that the board cannot articulate what personal interests Judge Grendell's testimony could have served—beyond merely implying that testifying in support of a bill that his wife sponsored is promoting their personal interests—is telling. Jud.Cond.R. 1.3 does not prohibit judges from testifying for or against bills simply because their spouses are sponsors of those bills. Because the board offered nothing more to support its finding that Judge Grendell "abuse[d] the prestige of [his] judicial office to advance the personal or economic interests of" himself or Representative Grendell, we conclude that he did not violate Jud.Cond.R. 1.3.

{¶ 16} However, Judge Grendell's testimony did go beyond Jud.Cond.R. 3.2's prohibition on voluntary legislative testimony that is not "[i]n connection with matters concerning the law, the legal system, or the administration of justice" or "matters about which the judge acquired knowledge or expertise in the course of the judge's judicial duties." It is true that some of Judge Grendell's testimony related to legal matters and his experiences as a judge. For example, his testimony about assuring potential jurors of their safety was related to the legal system. And regardless of the board's misgivings about the factual basis for it, his testimony about an increased caseload due to COVID-19 was information that he acquired in the course of his judicial duties. But the bulk of his testimony was unrelated to the law, the legal system, the administration of justice, or his knowledge and expertise acquired as a judge.

{¶ 17} Judge Grendell spent almost all his time testifying about the inadequacies of COVID-19 reporting and why he thought these inadequacies made it impossible for Ohioans to make informed decisions about their own lives. He discussed varied topics such as opiate-related deaths, suicides, the rates at which people were seeking medical care, business and school closures, and the similarities and differences between COVID-19 and past flu outbreaks. The entirety of the question-and-answer portion of his testimony consisted of his talking about the State's COVID-19-testing regime and how it could be improved. These are important topics that are worthy of discussion in the General Assembly. But because the topics were not connected with "the law, the legal system, or the administration of justice" or "matters about which [he] acquired knowledge or expertise in the course of [his] judicial duties," Jud.Cond.R. 3.2 prohibited Judge Grendell from testifying about them. We therefore conclude that Judge Grendell violated Jud.Cond.R. 3.2.

### 2. Jud.Cond.R. 3.2 is unconstitutional because it violates the First Amendment

{¶ 18} Judge Grendell's testimony went beyond what Jud.Cond.R. 3.2 allows, so we must consider his argument that Jud.Cond.R. 3.2 violates his free-speech rights. He contends that Jud.Cond.R. 3.2 is unconstitutional because it is facially overbroad in that it restricts too much constitutionally protected speech.

{¶ 19} Judge Grendell centers his argument on the First Amendment to the United States Constitution, although he also references Article I, Section 11 of the Ohio Constitution. Because his briefing is focused almost exclusively on his federal constitutional argument, we will take up that argument first.[1] And because we hold that Jud.Cond.R. 3.2 does not pass scrutiny under the First Amendment,

---

1. When both a federal and a state constitutional claim have been fully developed, there is a strong argument that this court should ordinarily consider the state claim first. *See, e.g.*, Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law*, 178-190 (2018). But in this case, because the state argument is undeveloped, we find it prudent to first take up the federal claim. *See State ex rel. Cincinnati Enquirer v. Bloom*, 2024-Ohio-5029, ¶ 32.

we find it unnecessary to reach the largely unbriefed issue of whether the restriction also violates Article I, Section 11 of the Ohio Constitution.

*i. Jud.Cond.R. 3.2 is a content-based restriction on speech that can be upheld only if it survives strict scrutiny.*

{¶ 20} As long as codes of conduct for lawyers and judges have been around, courts have been grappling with their relationship to the First Amendment. On the one hand, Ohio has an interest in "promot[ing] and maintain[ing] '[a]n independent, fair, and impartial judiciary' . . . to ensure 'the greatest possible public confidence in [the] independence, impartiality, integrity, and competence' of judges," and it furthers that interest with its Code of Judicial Conduct for judges. (Third and fourth bracketed text in original.) *In re Judicial Campaign Complaint Against O'Toole*, 2014-Ohio-4046, ¶ 23, quoting Jud.Cond.R., Preamble [1] through [3]. The same can generally be said about rules prescribing ethical standards for lawyers. *E.g.*, *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1074-1075 (1991). But on the other hand, lawyers and judges do not give up their First Amendment right to free speech just because they chose to pursue a career in law. In fact, the Code of Judicial Conduct itself acknowledges that the rules are subordinate to First Amendment requirements, cautioning that the rules "are rules of reason that should be applied consistent with constitutional requirements." Jud.Cond.R., Scope [5].

{¶ 21} Certain restrictions on the First Amendment–protected speech of lawyers and judges "cannot be justified by Ohio's interest in maintaining a competent and impartial judiciary." *O'Toole* at ¶ 43. The State's interest in protecting the integrity of legal institutions "is an insufficient reason 'for repressing speech that would otherwise be free.'" *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 841-842 (1978), quoting *New York Times v. Sullivan*, 376 U.S. 254, 272-273 (1964). In other words, restrictions on lawyers' and judges' speech that cannot survive ordinary First Amendment scrutiny cannot stand.

**{¶ 22}** The landmark case about how the First Amendment interacts with judicial codes of conduct is *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002). In *White*, a candidate for judicial office argued that his right to free speech was violated by the Minnesota Code of Judicial Conduct's "announce clause," which prohibited a judicial candidate, including an incumbent judge, from "announc[ing] his or her views on disputed legal or political issues." *White* at 768-770. Rather than employ some special test in the context of a code of judicial conduct, the United States Supreme Court simply conducted a normal First Amendment analysis— whether the announce clause could survive strict scrutiny. *See id.* at 774-775; *see also Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015) ("we hold today what we assumed in *White*: A State may restrict the speech of a judicial candidate only if the restriction is narrowly tailored to serve a compelling interest"). The Court held that the Minnesota provision prohibiting judicial candidates from announcing their views on disputed legal and political issues violated the First Amendment. *White* at 788.

**{¶ 23}** We did something similar in *O'Toole*. In that case, we considered whether a rule in the Ohio Code of Judicial Conduct that prohibited a judicial candidate from saying things that were true but misleading violated the First Amendment. *O'Toole*, 2014-Ohio-4046, at ¶ 1-2. After describing the ordinary First Amendment test for such a speech restriction, *id.* at ¶ 19-20, we held that the rule violated the First Amendment "because it chill[ed] the exercise of legitimate First Amendment rights," *id.* at ¶ 42, and could not "be justified by Ohio's interest in maintaining a competent and impartial judiciary," *id.* at ¶ 43.

**{¶ 24}** And although *White* was the first United States Supreme Court decision to strike down a rule in a code of judicial conduct, the Supreme Court has long held that the First Amendment applies the same to speech restrictions for legal professionals as it does to speech restrictions for everyone else. *See Garrison v. Louisiana*, 379 U.S. 64, 64-67 (1964) (holding that the actual-malice standard from

*New York Times v. Sullivan* applied to attorney speech critical of the judiciary); *see also Jenevein v. Willing*, 493 F.3d 551, 557-558 (5th Cir. 2007) (applying strict scrutiny to speech restrictions on elected judges). All this to say: there is no special test for speech restrictions on judges. Thus, what follows is an ordinary First Amendment analysis.

{¶ 25} The First Amendment prohibits the government from "abridging the freedom of speech." U.S. Const., amend. I. That means that, "[a]s a general matter, government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *O'Toole* at ¶ 19. Such restrictions are called content-based restrictions. We know a restriction is content based when it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Content-based restrictions violate the First Amendment unless they can survive strict scrutiny— that is, they "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* And of course, that goes for content-based restrictions on judges' speech in the Code of Judicial Conduct, too. *See O'Toole* at ¶ 20; *White*, 536 U.S. at 774-775; *Williams-Yulee*, 575 U.S. at 444.

{¶ 26} Jud.Cond.R. 3.2 is a content-based restriction. It prohibits judges from testifying before the General Assembly about all but a few topics. In other words, Jud.Cond.R. 3.2 applies to judges' speech "because of the topic discussed or the idea or message expressed," *Reed* at 163. Therefore, as disciplinary counsel acknowledges, Jud.Cond.R. 3.2 can be upheld only if it survives strict scrutiny.[2]

---

2. It is true that this court adopted Jud.Cond.R. 3.2 under its Article IV, Section 5(B) power to make rules governing the practice of law. But that power gives us the authority to reconsider the constitutionality of rules at any time—including in an appropriate case. *See O'Toole*, 2014-Ohio-4046, at ¶ 43-45. The general restriction on voluntary legislative testimony entered our rules as part of the now-superseded Code of Judicial Conduct in 1973, prior to the United States Supreme Court's decision in *White*. *See* Canon 4(B) of the 1973 Code of Judicial Conduct, 36 Ohio St.2d xxvi. The restriction was carried over with some modifications with the adoption of the current Code of

*ii. The restriction is not narrowly tailored to serve a compelling state interest*

**{¶ 27}** Disciplinary counsel asserts three compelling state interests for Jud.Cond.R. 3.2: "(1) the maintenance of an independent, fair, and impartial judiciary; (2) public confidence in the independence, impartiality, integrity, and competence of judges; and (3) the separation of powers between the judicial branch and the legislative and executive branches." We take up these interests one at a time.

**{¶ 28}** ***Judicial Impartiality.*** We start with the maintenance of an independent, fair, and impartial judiciary. Although disciplinary counsel uses "independent, fair, and impartial" as a phrase with a vague, collective meaning, it is clear that the state interest at issue is one of judicial impartiality. Disciplinary counsel argues that the provision serves a compelling state interest because "[a] judge who offers testimony in favor of a particular bill may find himself unable to preside impartially over a matter involving that bill."

**{¶ 29}** In *White*, the United States Supreme Court recognized that a state could have a compelling interest in judicial impartiality. *See White*, 536 U.S. at 775-776. But in doing so, it made clear that impartiality in this context means impartiality in its "root meaning"—that is, "the lack of bias for or against either *party* to the proceeding." (Emphasis in original.) *Id.* at 775. Thus, it found that the Minnesota provision prohibiting judicial candidates from announcing their views on disputed *issues* a poor fit for this interest:

> We think it plain that the announce clause is not narrowly
> tailored to serve impartiality (or the appearance of impartiality) in

---

Judicial Conduct in 2009. We have never disciplined a judge for violating Jud.Cond.R. 3.2—and we are unaware of disciplinary counsel ever charging a judge under the provision—so this case represents our first opportunity to consider the constitutionality of the provision in the context of an adversary proceeding.

this sense. Indeed, the clause is barely tailored to serve that interest *at all*, inasmuch as it does not restrict speech for or against particular *parties*, but rather speech for or against particular *issues*. To be sure, when a case arises that turns on a legal issue on which the judge (as a candidate) had taken a particular stand, the party taking the opposite stand is likely to lose. But not because of any bias against that party, or favoritism toward the other party. *Any* party taking that position is just as likely to lose. The judge is applying the law (as he sees it) evenhandedly.

(Emphasis in original.) *Id*. at 776-777.

{¶ 30} The Court also considered two less common meanings of impartiality. It noted that "[i]t is perhaps possible to use the term 'impartiality' in the judicial context . . . to mean lack of preconception in favor of or against a particular *legal view*." (Emphasis in original.) *Id.* at 777. But it concluded that while "[i]mpartiality in this sense may well be an interest served by the announce clause, . . . it is not a *compelling* state interest, as strict scrutiny requires." (Emphasis in original.) *Id.* It explained that "[a] judge's lack of predisposition regarding the relevant legal issues in a case has never been thought a necessary component of equal justice," because, "[f]or one thing, it is virtually impossible to find a judge who does not have preconceptions about the law." *Id.* For example, it would be almost impossible to find a judge who does not have preconceived views about the "'interpretation of the sweeping clauses of the Constitution and their interaction with one another.'" *Id.*, quoting *Laird v. Tatum*, 409 U.S. 824, 835 (1972) (separate memorandum of Rehnquist, J.).

{¶ 31} The Court then acknowledged that another (though also not common) meaning of impartiality "might be described as open-mindedness." *Id.* at 778. That "sort of impartiality seeks to guarantee each litigant, not an *equal*

chance to win the legal points in the case, but at least *some* chance of doing so." (Emphasis in original.) *Id.* "This quality in a judge demands, not that he have no preconceptions on legal issues, but that he be willing to consider views that oppose his preconceptions, and remain open to persuasion." *Id.* Although the Court did not decide whether such impartiality was a compelling state interest, it quickly dismissed any notion that the announce clause was actually designed to serve such an interest. *Id.* at 778-780. It explained that judges take any number of positions both before and after they are on the bench and that the announce clause covered such an "infinitesimal portion of the public commitments to legal positions" that it was implausible that this could be the object of the prohibition. *Id.* at 779.

{¶ 32} *White* makes clear that a state has a compelling state interest in protecting judicial impartiality under the "root meaning" of the term that encompasses "the lack of bias for or against either *party* to the proceeding." (Emphasis in original.) *Id.*, 536 U.S. at 775. There is no compelling state interest, however, in guaranteeing parties judges who have a "lack of predisposition regarding the relevant legal issues in a case." *Id.* at 777. And to the extent that the asserted state interest is one of judicial open-mindedness, we conclude, as the Supreme Court did in *White*, that that interest is not relevant here. Just as in *White*, the restriction in Jud.Cond.R. 3.2 encompasses only an "infinitesimal portion of the public commitments to legal positions" that a judge might undertake over the course of a career, *id.* at 779.

{¶ 33} In addition to establishing that judicial impartiality is a compelling state interest, disciplinary counsel also must establish that the restriction is narrowly tailored to serve that compelling interest. A content-based speech restriction is not narrowly tailored to achieve a compelling state interest unless it is the least restrictive means of achieving that interest. *O'Toole*, 2014-Ohio-4046, at ¶ 30. Disciplinary counsel must be able to show that Jud.Cond.R. 3.2 "does not

14

'unnecessarily circumscrib[e] protected expression.'" (Bracketed text in original.) *White* at 775, quoting *Brown v. Hartlage*, 456 U.S. 45, 54 (1982). He falls short.

{¶ 34} As in *White*, the restriction on testimony before a public body "is barely tailored to serve" the interest in preventing party bias "at all," *id.* at 776. In many respects, the restriction at issue here is equivalent to the restriction found unconstitutional in *White*: it too prevents a judge from taking a position on "disputed legal or political issues," *id.* at 768. The only difference is that Jud.Cond.R. 3.2's restriction applies only to public testimony and communications with government officials. But this narrowing does nothing to save the provision, because the narrowing has virtually no connection to the State's interest in protecting against party bias.

{¶ 35} The restriction sweeps in almost all public testimony, regardless of whether that testimony has anything to do with a case that is likely to come before the judge. This disciplinary proceeding highlights the overbreadth of the provision. Had H.B. 624 become law, there is virtually no possibility that Judge Grendell would have had a case involving the law—which concerned the reporting duties of local health officials and the Ohio Department of Health—come before him in his capacity as a probate- and juvenile-court judge. There is no reason, then, to think that Jud.Cond.R. 3.2 would have protected against party bias in Judge Grendell's situation or in a host of other applications.

{¶ 36} And Jud.Cond.R. 3.2 not only prohibits judges from voluntarily testifying before "an executive or a legislative body or official" unless the testimony relates to a few select topics; it also prohibits judges from "consult[ing] with" executives and legislators except about those same few topics. Under the provision, a judge could not share with a legislator his views on school funding, highway improvements, tax policy, or any number of important civic issues. It's hard to imagine that such restrictions do anything to advance the State's interest in ensuring against judges who are biased for or against a particular party.

{¶ 37} By sweeping in a wide variety of protected speech that has no relation to the State's compelling interest in protecting judicial impartiality, the restriction is vastly overinclusive. Disciplinary counsel seeks to partially address the overinclusivity problem by arguing that judges are free to "speak freely in support of or [in] opposition to legislative or executive interests in private" and "may also support or oppose such issues in public" if done in conformance with the Code, and that Jud.Cond.R. 3.2 will not chill speech because "[a] judge will have little difficulty determining when the judge speaks at a public hearing or consults with other government bodies and must paint within the lines drawn by Jud.Cond.R. 3.2." But none of that is clear from Jud.Cond.R. 3.2 itself. And disciplinary counsel's attempt to narrow the restriction highlights a related constitutional problem with Jud.Cond.R. 3.2—one of vagueness. Judges know and talk to executives and legislators. Sometimes they talk about current issues. How are judges supposed to know when their conversations go beyond merely talking about the issues and cross the line into "consult[ing]" about them? To avoid any disciplinary actions, many judges would probably choose to avoid these conversations altogether. The First Amendment disfavors rules that chill speech, *see O'Toole*, 2014-Ohio-4046, at ¶ 41-43, and it does not allow the Code of Judicial Conduct to chill judges into avoiding meaningful conversations about current issues with their elected representatives—and in Judge Grendell's case, his wife. *See Winter v. Wolnitzek*, 834 F.3d 681, 690 (6th Cir. 2016) (conduct code banning judicial candidates from making speeches for or against a political candidate or organization violated First Amendment because it prohibited them from speaking on "disputed legal and political subjects").

{¶ 38} Jud.Cond.R. 3.2 is also underinclusive—it makes exceptions for speech the prohibition of which would also further the interests that disciplinary counsel contends are compelling. "[U]nderinclusiveness can raise 'doubts about whether the government is in fact pursuing the interest it invokes, rather than

disfavoring a particular speaker or viewpoint.'" *Williams-Yulee*, 575 U.S. at 448, quoting *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 802 (2011). Disciplinary counsel argues that a judge who testifies in favor of a bill will not be, or will appear not to be, impartial when adjudicating "a matter involving that bill." Disciplinary counsel does not explain what he means by "a matter involving [a] bill," but it seems evident that there are two possibilities. First, a case might come before the judge that challenges the constitutionality of a bill passed by the General Assembly. Second, a case could come before the judge when the judge is asked to apply legislation about which he or she has testified—for example, a judge who testifies about criminal-sentencing reform might be asked to apply a criminal-sentencing law.

{¶ 39} Jud.Cond.R. 3.2 is a poor fit for either situation. If the concern is about a judge having to apply a law about which he testified, why allow judges to testify in favor of a bill "concerning the law, the legal system, or the administration of justice"? Cases about laws that concern the law, the legal system, or the administration of justice are far more likely to arise in a judge's courtroom than cases about other types of laws, but the provision allows testimony about the former and not the latter. Under the provision, a juvenile-court judge could testify about a bindover law that the judge would be likely to administer every day but not about a tax law change that could never conceivably come to the judge's courtroom.

{¶ 40} The provision, in other words, has the effect of allowing judges to testify about laws that are the most likely to be implicated in a proceeding in a judge's courtroom but not about those that are much less likely to be implicated in a proceeding before the judge. So if the point of the provision is that a judge cannot be impartial in applying a law that the judge has testified about, the provision is vastly underinclusive.

{¶ 41} On the other hand, one might conclude that the purpose of the provision is to prevent a judge from testifying about legislation that the judge may

later be asked to assess the constitutionality of. The problem here is that the provision is not narrowly tailored to address such a concern.

{¶ 42} As an initial matter, it seems unlikely that such a problem could arise very often. The provision sweeps in all Ohio judges, and for most judges it would seem unlikely that most legislative bills would ever be subject to a challenge in their courtroom. And for those judges who are likely to hear such a challenge, there is a much more narrowly tailored means available to protect the State's interest in protecting against party bias—one that is already part of the Code of Judicial Conduct. Jud.Cond.R. 2.10(B) provides that "[a] judge shall not, in connection with cases, controversies, or issues that are likely to come before the court, make pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office." Thus, to the extent that a judge's public testimony involves a matter that is likely to come in front of the judge, Jud.Cond.R. 2.10(B) prohibits the judge from making any pledge, promise, or commitment—in a legislative hearing or any other setting—that would be inconsistent with the impartial performance of the judge's duties.

{¶ 43} But that's not all. Jud.Cond.R. 2.11(A) requires a judge to recuse from a case when his "impartiality might reasonably be questioned." So if a judge's testimony might lead one to reasonably question a judge's impartiality in a case that actually comes before the judge, the judge is required to recuse. And if the judge refuses, a litigant can file an affidavit with the chief justice of this court requesting the judge's disqualification. *See, e.g.*, Ohio Const., art IV, § 5(C) ("The chief justice of the supreme court . . . shall pass upon the disqualification of any judge of the courts of appeals or courts of common pleas or division thereof."); R.C. 2701.03 (creating a procedure for a party to ask the chief justice to disqualify a common-pleas-court judge); R.C. 2101.39 (same, for a probate-court judge). Subsequent recusal is a far less restrictive means than a broad-reaching, upfront prohibition. And recusal in such cases will not create the problem that the Court foresaw in

18

*Williams-Yulee*, where a "rule requiring recusal in every case in which a lawyer or litigant made a campaign contribution would disable many jurisdictions." *Williams-Yulee*, 575 U.S. at 435-436. To the contrary, it will be the rare case in which legislation (not "concerning the law, the legal system, or the administration of justice," Jud.Cond.R 3.2) about which a judge has testified ends up the subject of a challenge in the judge's courtroom. Put simply, Jud.Cond.R 3.2 is not the least restrictive means of achieving the State's interest in judicial impartiality.

{¶ 44} Because Jud.Cond.R. 3.2 is vague, overinclusive, underinclusive, and not narrowly tailored to serve the State's compelling interest in judicial impartiality, it cannot be justified on the basis of protecting the State's interest in an impartial judiciary.

{¶ 45} ***Public Confidence.*** Disciplinary counsel's second asserted compelling state interest is "public confidence in the independence, impartiality, integrity, and competence of judges."

{¶ 46} In *Williams-Yulee*, the United States Supreme Court found that Florida had a compelling state interest in protecting public confidence in the integrity and impartiality of the judiciary that could be protected by prohibiting judges and candidates from personally soliciting campaign funds. *Williams-Yulee*, 575 U.S. at 445-448. The Court noted that "'the spectacle of lawyers or potential litigants directly handing over money to judicial candidates'" could diminish public confidence in the impartiality of the judiciary. *Id.* at 447, quoting *In re Fadeley*, 310 Ore. 548, 565 (1990). Thus, it found a ban on direct judicial solicitations of campaign contributions to be "one of the rare cases in which a speech restriction withstands strict scrutiny." *Id.* at 444.

{¶ 47} Because "most donors are lawyers and litigants who may appear before the judge they are supporting," the *Williams-Yulee* Court explained, "it is the regrettable but unavoidable appearance that judges who personally ask for money may diminish their integrity." *Id.* at 434. This is because "a judge in deciding cases

19

may not follow the preferences of his supporters or provide any special consideration to his campaign donors." *Id.*

{¶ 48} The compelling state interest that the Supreme Court identified in *Williams-Yulee* is closely related to the one that the Court identified in *White*. In *White*, the Court identified a compelling state interest in protecting against judges who were actually biased for or against a party. In *Williams-Yulee*, the Court found a compelling state interest in protecting against the *appearance* of this same kind of impropriety—that is, protecting against the appearance of judges who were actually biased for or against a party.

{¶ 49} Here, disciplinary counsel does not make any argument of the sort advanced in *Williams-Yulee*. He simply asserts that "even if the judge could be impartial, litigants and members of the public could not have confidence in the impartiality of a judge who publicly supported or opposed legislation that later comes before that judge." He also contends that "this concern is by no means limited to that particular legislation the judge supported or opposed."

{¶ 50} In making these arguments, disciplinary counsel runs head first into contrary United States Supreme Court precedent. As the Court held in *White* in rejecting a similar argument, "since avoiding judicial preconceptions on legal issues is neither possible nor desirable, pretending otherwise by attempting to preserve the 'appearance' of that type of impartiality can hardly be a compelling state interest either," *White*, 536 U.S. at 778. Just as Jud.Cond.R. 3.2's restriction is not narrowly tailored to protect judicial impartiality, it is not narrowly tailored to protect the *appearance* of that impartiality. Disciplinary counsel cannot meet "the narrow tailoring of strict scrutiny . . . by deploying an elusive and overly-broad interest in avoiding the 'appearance of impropriety,'" *Jenevein*, 493 F.3d at 560. Further, all the over- and underinclusivity and vagueness problems we have already identified apply equally to the asserted "appearance" state interest. Thus, Jud.Cond.R. 3.2

cannot be justified on the basis of protecting the State's interest in maintaining public confidence in an impartial judiciary.

**{¶ 51}** *Separation of powers.* That brings us to the third compelling state interest asserted by disciplinary counsel: protecting the separation of powers. We note at the outset that the United States Supreme Court has never recognized protecting the separation of powers as the type of compelling state interest that could justify a restriction on speech.

**{¶ 52}** Indeed, it seems odd to even suggest that such an interest is one that could justify a speech restriction. The separation of powers is protected by the structural design of our Constitution, under which Ohioans have delegated the legislative power to the General Assembly, the executive power to various executive officers, and the judicial power to the courts. *TWISM Ents., L.L.C. v. State Bd. of Registration for Professional Engineers & Surveyors*, 2022-Ohio-4677, ¶ 30. By constitutional design, "[e]ach branch of government 'can exercise such power, and such only, as falls within the scope of the express delegation.'" *Id.* at ¶ 32, quoting *Scovill v. Cleveland*, 1 Ohio St. 126, 134 (1853). Fundamentally, the separation of powers is about prohibiting government officials of one branch from exercising the powers of another branch.

**{¶ 53}** But by its nature, a speech restriction doesn't protect against one branch of government *exercising the power* of another. Rather, it limits communications between the branches of government. It is a strange notion that the State would have a compelling interest that would justify limiting a right explicitly guaranteed by our Constitution (free speech) in the name of maintaining the structural guarantees implicit in the same Constitution.

**{¶ 54}** Indeed, our system of separation of powers depends on communication between and healthy debate among the branches of government. Presidents and governors lobby the legislature. Legislatures criticize and investigate the executive branch. Judges have regular communications with

prosecutors and other executive-branch attorneys who appear in their courtrooms. And judicial opinions often serve as a form of communication with the other branches of government.

{¶ 55} In arguing that the separation of powers presents a compelling state interest that can justify a speech restriction, disciplinary counsel insists that "[t]he judiciary . . . cannot assert any control over the '"performance of duties that are purely legislative in character and over which such legislative bodies have exclusive control."'" Disciplinary counsel's answer brief at 4, quoting *Toledo v. State*, 2018-Ohio-2358, ¶ 27, quoting *State ex rel. Grendell v. Davidson*, 1999-Ohio-130, ¶ 15. That's true. But speech by itself is not an exercise of power. A judge who voluntarily testifies before a legislative committee is asserting no more control over the General Assembly than the attorney general asserts over this court when he files an amicus brief. There are simply no separation-of-powers concerns in this case.

{¶ 56} The only authority disciplinary counsel cites for the proposition that the separation of powers is a compelling state interest in the context of a speech restriction is a decision from the Arkansas Supreme Court. *See Griffen v. Arkansas Judicial Discipline & Disability Comm.*, 355 Ark. 38, 51 (2003). And notably, that court concluded that the Arkansas rule at issue, which contained a prohibition on legislative testimony similar to the one in Jud.Cond.R. 3.2,[3] failed strict scrutiny. *See id.* at 60. We do not find the Arkansas Supreme Court's decision persuasive on the question of whether separation of powers is a compelling state interest that can justify a restriction on speech.

---

3. The Arkansas provision at issue in *Griffen* provided: "A judge shall not appear at a public hearing before, or otherwise consult with, an executive or legislative body or official except on matters concerning the law, the legal system or the administration of justice or except when acting pro se in a matter involving the judge or the judge's interests." *Griffen* at 45, citing Arkansas Code of Judicial Conduct, Canon 4(C)(1).

{¶ 57} We conclude that Jud.Cond.R. 3.2 is not narrowly tailored to further the first two compelling state interests advanced by disciplinary counsel. We also conclude that the third asserted compelling state interest—protecting the separation of powers—is not the sort of state interest that can be used to justify a restriction on speech.

{¶ 58} Because Jud.Cond.R. 3.2 cannot survive strict scrutiny, we decline to enforce it in this case. Our decision today, however, does not mean that we endorse testimony by judges at public hearings on matters not connected with their judicial roles. There are good reasons why judges should tread with caution before embroiling themselves in the day-to-day workings of the state legislature. But whether we may discipline someone for engaging in constitutionally protected conduct is a far different question than whether such conduct is a good idea.

## II. COUNT 3: THE TEA PARTY EVENT

{¶ 59} The board concluded that Judge Grendell committed multiple disciplinary violations related to a presentation that he made at a Geauga County Tea Party meeting and to actions he took leading up to and after the meeting.

### A. Facts

{¶ 60} By June of 2019, there was a long-running feud between Judge Grendell and Geauga County Auditor Charles Walder.

{¶ 61} Walder became the county auditor in April 2018. As auditor, it is his duty to maintain the county treasury and to disburse funds when a county entity makes a purchase. R.C. 319.16. So when Judge Grendell's court buys something, it submits evidence of that purchase to Walder and Walder pays the bill from the county treasury. Before Walder became auditor, this process was simple and uneventful. But Walder determined that the processes in place were inadequate to protect the county treasury, so he implemented additional procedures shortly after he took office. Walder began requiring more evidence of the court's purchases before he would pay than the court had previously provided. And he demanded

that all communication between the court and his office go through his chief compliance officer.

{¶ 62} These new procedures created friction between the court and the auditor. They created delays in payment that led to several incidents, including Walder kicking court staff out of the public area of his office, Walder filing allegations of falsifying documents against court staff, Walder and Judge Grendell sending strongly worded letters to each other, and Judge Grendell requesting a legal opinion from the county prosecutor, who in turn requested an opinion from the attorney general. Things got bad enough that Judge Grendell filed a mandamus action against the auditor for his refusal to pay the court's bills. We ultimately granted him a writ of mandamus and ordered Walder to pay the contested bills. *State ex rel. Grendell v. Walder*, 2022-Ohio-204, ¶ 70.

{¶ 63} The delays persisted and the probate court found them unacceptable—so rather than wait for Walder to mail checks to vendors, Judge Grendell asked him to give the checks to court staff so that they could send them to the vendors. That made a new process for the court: it would submit evidence of purchases to the auditor, the auditor would approve the purchases and write checks to pay for them, court staff would go to the auditor's office to review the documentation related to the checks (purchase orders, invoices, etc.) and sign for and pick up the checks, and then court staff would send the checks to the vendors. But the friction continued, and further incidents followed.

{¶ 64} The worst of the incidents occurred on June 27, 2019. That morning, court staff Kim Laurie and Seth Miller went to the public portion of the auditor's office to ask about a vendor who had not yet been paid.[4] When they arrived, auditor staff provided Laurie and Miller with a stack of documents to review so that they could sign for and take several checks to send to vendors. While they reviewed the

---

4. The court and the auditor's office are in the same building. So the June 27 incident took place both inside of and just outside of that building.

materials and began signing, Walder's administrative assistant emerged from the back of the office and told Laurie and Miller that they needed to leave because they were causing a disturbance. Confused, Laurie asked if Miller could finish reviewing the documents and signing for the checks. The administrative assistant told them no. According to Laurie, she then asked if they could take the documents back to their office to finish reviewing and signing them and the administrative assistant said yes. Miller later said that to diffuse the awkward situation, as he and Laurie left, he joked, "Well, maybe we won't bring them back."

{¶ 65} Laurie and Miller returned to their offices. Miller continued to review the materials from the auditor and sign for the checks. As he reviewed and signed, Officer Bernakis of the Chardon City Police Department entered Laurie's office and asked her if she had stolen documents from the auditor. One of the auditor's staff had called the police and reported the documents stolen by Laurie and Miller. Shocked, Laurie explained what had happened, and she took Officer Bernakis to Miller's office. Miller had nearly finished reviewing and signing, and the three of them then went into the courtroom to explain the situation to Judge Grendell and to ask him what to do. He told Miller to finish reviewing and signing the documents and then return them. Miller finished, and Officer Bernakis escorted him back to the auditor's office to return the documents. Laurie followed them shortly after.

{¶ 66} After they returned the documents, Laurie, Miller, and Officer Bernakis spoke outside on the sidewalk, where they were later joined by Chardon Police Lieutenant Troy Duncan. Lt. Duncan told Laurie and Miller to go back to their offices while he went to a meeting in the auditor's office to figure out what was going on between the auditor and the court, and that he would come back and talk to them afterwards. So they did.

{¶ 67} At the meeting were Lt. Duncan, Sheriff Scott Hildenbrand, Walder, and Walder's administrative assistant. They discussed the incidents that had

occurred between the court and the auditor's office over the prior several months, as well as the events from that day. Lt. Duncan and Sheriff Hildenbrand expressed skepticism about criminal charges being warranted, so they suggested inviting county prosecutor Jim Flaiz to get his opinion on the situation. Flaiz joined the meeting and advised Walder that any criminal charges would be misdemeanors that would need to be handled by the police prosecutor, Jim Gillette. Flaiz also opined that the auditor had the authority to exclude people from his office. They adjourned the meeting with a plan: Walder would write a letter to Judge Grendell telling him that his staff were not welcome in the auditor's office and would be considered trespassers if they came in, and Lt. Duncan would write a report about that day's incidents to give to Gillette for review.

{¶ 68} After leaving the meeting, Lt. Duncan returned to Laurie's and Miller's offices to update them. As he arrived, he received a call over his radio that Laurie and Miller were in the auditor's office. They had returned to turn in a few more signed purchase orders before the close of day. As Laurie and Miller entered the auditor's office, the auditor's staff retreated to the back and ignored them. Laurie and Miller stayed, perplexed, for a few moments, and just as they decided to leave, Lt. Duncan walked in. The three of them left the office and returned to the sidewalk where they had spoken earlier. They calmly discussed the situation for several minutes until Judge Grendell came outside, still wearing his robe. According to Lt. Duncan, the discussion with Judge Grendell was pleasant until he told Judge Grendell that Laurie and Miller would face trespass charges if they entered the auditor's office. At that point, Judge Grendell became understandably upset. According to Lt. Duncan, Judge Grendell said they can't do that, and yelled that if he needed to, he would issue a court order that allowed Laurie and Miller to enter the auditor's office to conduct court business and anyone who interfered with that order could be held in contempt—including law-enforcement officers. According to Laurie and Miller, Judge Grendell did not raise his voice; he was just

direct. After Judge Grendell made his point, he, Laurie, and Miller went back to their offices.

{¶ 69} Later that day, Judge Grendell went to the Chardon police station to talk to Chief of Police William Niehus. They had a direct conversation about what had happened that day and how things would move forward. Judge Grendell explained that his staff had a right to be in the public space in the auditor's office to conduct court business and that he would be entering an order that says so. And as he puts it, he expressed concern that if a police officer were to arrest court staff "for doing public business in a public place," the department could open itself up to liability under 42 U.S.C. 1983. After that short conversation, Judge Grendell left.

{¶ 70} That same day, Judge Grendell called Gillette—the police prosecutor who would handle any misdemeanor charges against Laurie and Miller. He explained everything that had happened. He specifically mentioned that he was going to put on an order making clear that his staff could conduct court business in the auditor's public office and that he was concerned that Chardon police officers would expose themselves to a § 1983 action if they falsely arrested Laurie or Miller. Gillette was not concerned. The call ended after two or three minutes.

{¶ 71} Several letters followed. To start, Walder sent Judge Grendell the letter that he had told the sheriff and the county prosecutor he would send. It informed Judge Grendell that Laurie and Miller were not permitted to enter the auditor's office and would face criminal trespassing charges if they did so. Judge Grendell responded with a letter to Walder that again explained his intended order and the consequences of violating the order. He also lamented that Walder's actions "may result in unnecessary federal litigation at county taxpayers' expense." Judge Grendell also sent a letter to Lt. Duncan. In that letter, Judge Grendell said that he apologized if Lt. Duncan "mistook [Judge Grendell's] explanation of the procedures [he] was going to take to assure that [his] Court personnel could still

conduct statutorily required official court business in a public area within a public office as a threat." He explained that his only intention had been to describe what processes he would need to take to "assure that the Court [could] provide vital services." Regardless, Judge Grendell asked Lt. Duncan to "please accept [his] apology if [he] offended [him] during [their] conversation."

{¶ 72} The fallout from the June 27 incident was not over. A local newspaper—the Geauga County Maple Leaf—picked up the story on July 11. It described the June 27 incident from multiple perspectives, including an unattributed account of the incident stating that Judge Grendell "angrily threatened Chardon Police Lt. Troy Duncan with arrest." It also obtained a video of the incident and shared an altered version of it online, splicing together different videos into one continuous stream and adding captions that were not on the original video. The Geauga County Tea Party took interest in the incident and invited Judge Grendell and Walder to a meeting to discuss what had happened that day. Judge Grendell accepted the invitation, but Walder declined, explaining that he was unsure about the status of a possible investigation into the incident.

{¶ 73} Judge Grendell opened his remarks at the Tea Party meeting by expressing regret that Walder had not accepted the invitation to attend. He said that he found Walder's explanation for declining questionable considering that Walder himself was not being investigated, and then he suggested that Walder would not be investigated "because he's protected by his buddy the county prosecutor." He then provided his perspective on the tension between his court and the auditor's office since Walder took office. And he walked through the events of June 27 step by step. He defended his actions along the way, explaining that his only intent was to allow his court staff to continue to do the court's work in public spaces. Toward the end of his remarks, he took a few questions. Audience members asked Judge Grendell what could be done about the "misfeasance" by the auditor. Judge Grendell explained that as the probate-court judge, he could file a mandamus action

to compel the auditor to perform his legal duty to pay the probate court's bills, but that he did not intend to do so, because that would just amplify an already politically charged fight between county entities. When pressed by the audience about what they could do, he simply told them that the supporting documentation of the events he had discussed was available to them and that there are actions that they could take, but that he was "just [there] just to tell [them] the facts." Judge Grendell concluded by presenting the video that the Maple Leaf had shared online. Before showing it, he described the alterations that had been made to it—that it contained several extended pauses and captions, neither of which were part of the original. He attributed these alterations to the auditor's office, saying that it had "doctored" the video.

{¶ 74} After the Tea Party meeting, Judge Grendell contacted Gillette and Chief Niehus once more each. Judge Grendell had heard a rumor that a special prosecutor had been appointed to investigate the June 27 incident sometime in late summer. According to Gillette, he had determined that no criminal charges were appropriate because he considered it an "internal political dispute." Flaiz, however, who had a contentious relationship with Judge Grendell, pushed for a special prosecutor. Gillette ultimately acquiesced, believing that any experienced prosecutor would conclude that no charges were warranted.

{¶ 75} Judge Grendell asked a friend to reach out to Gillette to see if a special prosecutor had been appointed. Gillette called Judge Grendell and left him a voicemail telling him that his office would not be taking any action against any employees of either the court or the auditor and characterizing the incident as a "closed investigation" in the police prosecutor's office. But he mentioned that Flaiz had requested that a special prosecutor be appointed to investigate the incident. After receiving this voicemail, Judge Grendell approached Chief Niehus at a fundraiser for the Chardon Rotary Club. He asked Chief Niehus whether a special prosecutor had been appointed to investigate the incident. When Chief Niehus told

him that Flaiz had appointed a special prosecutor, Judge Grendell simply walked away.

**{¶ 76}** The board determined that Judge Grendell, through his actions before and after the Tea Party meeting and by his public comments at the meeting, committed multiple violations of Jud.Cond.R. 1.2 and 1.3. Jud.Cond.R. 1.2 requires a judge to act "in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary" and to "avoid impropriety and the appearance of impropriety." Jud.Cond.R. 1.3 prohibits a judge from "abus[ing] the prestige of judicial office to advance the personal or economic interests of [himself] or others." The board also found that Judge Grendell, through his remarks at the Tea Party meeting, violated Jud.Cond.R. 2.10(A)'s prohibition on statements that might interfere with a fair trial or hearing.

### B. Objections

**{¶ 77}** Judge Grendell objects to the board's findings and recommendations regarding his remarks at the Geauga County Tea Party meeting and all the incidents before and after the meeting. With respect to the meeting, Judge Grendell argues that his remarks did not violate Jud.Cond.R. 1.2, 1.3, or 2.10(A) and that, regardless, imposing a disciplinary sanction would be unconstitutional as applied to those remarks.[5] And with respect to the other incidents, he argues that he didn't violate Jud.Cond.R. 1.2 or 1.3. The Tea Party meeting was the main event, so we will start our analysis there.

---

5. The board did not consider any of Judge Grendell's constitutional arguments, "deeming them to be within the exclusive purview of the Supreme Court." Such forbearance was appropriate as to Judge Grendell's facial constitutional challenge to Jud.Cond.R. 3.2's prohibition on public testimony and consultation with executive- or legislative-branch officials. Because we promulgated the Code of Judicial Conduct, it is appropriate for us to consider in the first instance a facial challenge to a rule. But the board should have considered Judge Grendell's as-applied constitutional challenge relating to the Tea Party meeting. The Code of Judicial Conduct makes clear that its rules are "rules of reason that should be applied consistent with constitutional requirements." Jud.Cond.R., Scope [5]. And both the board and disciplinary counsel are bound to follow the state and federal Constitutions.

#### 1. *Imposing a disciplinary sanction on Judge Grendell for his remarks at the Tea Party meeting would violate his right to free speech*

{¶ 78} Judge Grendell brings an as-applied challenge to the board's recommended sanctions for his comments at the Tea Party meeting. That means that he is not arguing that Jud.Cond.R. 1.2, 1.3, and 2.10(A) should be struck down as unconstitutional. Instead, he is arguing that the board's recommended sanctions would be unconstitutional as applied to his particular conduct here. In other words, he says that it would be unconstitutional to punish him under Jud.Cond.R. 1.2, 1.3, and 2.10(A) for his remarks at the Tea Party meeting. Relevant here, the Code of Judicial Conduct itself provides that its rules "are rules of reason that should be applied consistent with constitutional requirements." Jud.Cond.R., Scope [5].

{¶ 79} Jud.Cond.R. 1.2, 1.3, and 2.10(A) are very broad. Because our resolution of Judge Grendell's as-applied challenge does not affect the general validity of the rules, we proceed directly to that challenge. And again, because the briefing in this case focuses on the First Amendment and the First Amendment is determinative, we begin and end our constitutional analysis with that provision.

{¶ 80} The First Amendment protects the "freedom of speech." U.S. Const., amend. I. At the very core of the First Amendment's protection is political speech: speech about "'candidates [for public office], structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes.'" *Hartlage*, 456 U.S. at 52-53, quoting *Mills v. Alabama*, 384 U.S. 214, 218-219 (1966). Because political speech is core First Amendment speech, restrictions that "burden political speech are 'subject to strict scrutiny,' which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Citizens United v. Fed. Election Comm.*, 558 U.S. 310, 340 (2010), quoting *Fed. Election Comm. v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 464 (2007) (Roberts, C.J., separate opinion).

**{¶ 81}** There is no question that disciplinary counsel is seeking to punish Judge Grendell for core political speech: when it comes to the charges related to the Tea Party meeting, "this case involves punishment of pure speech in the political forum," *Gentile*, 501 U.S. at 1034. The Geauga County Tea Party invited both Judge Grendell and Walder to discuss the June 27 incident shortly after it was reported in the Geauga County Maple Leaf. Put simply, a group of civic-minded voters read in a local newspaper about a public dispute that involved multiple county elected officials and local law enforcement and invited the two main elected officials involved in the dispute to come explain themselves before a meeting of their political party. In a healthy act of democracy, engaged voters of Geauga County asked Judge Grendell to come speak with them in an inherently political context.

**{¶ 82}** Not only was the context of the meeting political. The content of Judge Grendell's remarks concerned "'the manner in which government is operated or should be operated, and . . . matters relating to political processes,'" *Hartlage* at 53, quoting *Mills* at 218-219. He discussed the relationship between his court and the auditor's office, their duties, how those duties were being carried out, and the friction between him and Walder and their respective staffs. He presented his version of the facts of the June 27 incident and his intentions behind his actions during and after the incident. And he explained what legal action he could (but would not) take—file a mandamus action against the auditor—and what actions the citizens attending the meeting could take. Because Judge Grendell's remarks at the Tea Party meeting were about the operations and processes of local government given in a political context, they are entitled to the strongest First Amendment protection. To put it simply, disciplinary counsel seeks to regulate speech in "an area in which the importance of First Amendment protections is 'at its zenith,'" *Meyer v. Grant*, 486 U.S. 414, 425 (1988), quoting *Grant v. Meyer*, 828 F.2d 1446, 1457 (10th Cir. 1987).

{¶ 83} Because Judge Grendell's remarks were core political speech, the government may only punish him for those remarks if it satisfies strict scrutiny. In other words, the government must justify its speech restriction with a compelling state interest and then must show that its application of the restriction in this case is narrowly tailored to serve that interest. *See, e.g.*, *TikTok, Inc. v. Garland*, 604 U.S. 56, 67-72 (2025) (holding that, as applied to the challengers, the government sufficiently justified its speech restriction and showed that the restriction was sufficiently tailored to the justification); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 25-40 (2010) (same); *Fed. Election Comm. v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 256-263 (1986) (holding that the government did not sufficiently justify its restriction on the challenger's speech because its interest in applying the restriction against the challenger was not a compelling interest).

{¶ 84} The board did not explain exactly how Judge Grendell violated Jud.Cond.R. 1.2, 1.3, and 2.10(A). It just summarily recommended sanctions after it found Judge Grendell's remarks at the Tea Party meeting "baseless and disparaging," "reckless and untrue," "biased," and "filled with inaccuracies and half-truths." Essentially, it appears that the board recommended punishing him because it found his remarks erroneous and misleading. But we cannot punish Judge Grendell for that reason.

{¶ 85} If a speaker does not knowingly lie or have reckless disregard as to whether what he is saying is true, his speech is protected by the First Amendment—even if it is erroneous or misleading. We recognized that in *O'Toole* when we held that a rule in the Ohio Code of Judicial Conduct violated the First Amendment by prohibiting a judicial candidate from saying things that were true but might be misleading. *O'Toole*, 2014-Ohio-4046, at ¶ 2, 42. That rule chilled an unjustifiable amount of protected speech—speech such as "innocent misstatements or . . . honest, truthful statements made in good faith but that could deceive some listeners." *Id.* at ¶ 42. That sort of speech is protected because "'erroneous statement[s are]

inevitable in free debate, and . . . must be protected if the freedoms of expression are to have the "breathing space" they "need . . . to survive."'" (Second ellipsis in original.) *Hartlage*, 456 U.S. at 60, quoting *New York Times*, 376 U.S. at 271-272, quoting *Natl. Assn. for Advancement of Colored People v. Button*, 371 U.S. 415, 433 (1963). It is not uncommon for elected officials to mistakenly say something inaccurate or misleading. When they do, their opponents, journalists, and citizens are usually quick to point it out. That is the preferred First Amendment remedy: "more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).

**{¶ 86}** Other than the board's conclusory statements in a single paragraph, neither it nor disciplinary counsel point to any evidence or provide any argument that Judge Grendell knowingly or recklessly misled the attendees of the Tea Party meeting. From what we can tell from the record, Judge Grendell simply gave his side of the story regarding the June 27 incident with the knowledge that was available to him at the time. Even if what he said was misleading, without more, he cannot constitutionally be punished for it.

**{¶ 87}** Perhaps recognizing that Judge Grendell cannot be punished for misleading political speech, disciplinary counsel takes a different approach. Rather than justify Jud.Cond.R. 1.2, 1.3, and 2.10(A) with a compelling state interest and arguing that the recommended sanctions are narrowly tailored to serve that interest, disciplinary counsel says that Judge Grendell "appears to contend that there must be an exception to discipline for the statements he made at a Tea Party meeting" and argues that Judge Grendell "has no categorical First Amendment right to freedom from discipline for statements if he simply casts them as opinion and makes them in public." Whether or not that argument is right, it was disciplinary counsel's burden to satisfy strict scrutiny in the face of Judge Grendell's as-applied First Amendment challenge.

{¶ 88} Disciplinary counsel did not meet his burden. He neither sets forth a compelling state interest to justify the speech restriction nor explains how restricting Judge Grendell's speech at the Tea Party meeting is tailored to meet that interest. Because he has not demonstrated a compelling interest or narrow tailoring in this case, he did not satisfy strict scrutiny.

{¶ 89} "'"[T]here is practically universal agreement that a major purpose of" the First Amendment "was to protect the free discussion of governmental affairs."'" *Arizona Free Ent. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 755 (2011), quoting *Buckley v. Valeo*, 424 U.S. 1, 14 (1976), quoting *Mills*, 384 U.S. at 218. For this reason, restrictions that "inhibit robust and wide-open political debate without sufficient justification cannot stand." *Id.* "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison*, 379 U.S. at 74-75. Judge Grendell's as-applied challenge succeeds; we will not punish him for his remarks at the Tea Party meeting.

## 2. Disciplinary counsel has not established that a violation of Jud.Cond.R. 1.2 or 1.3 occurred before or after the Tea Party meeting

{¶ 90} The board also found rule violations for Judge Grendell's conduct before and after the Tea Party meeting. The board determined that Judge Grendell violated Jud.Cond.R. 1.2 seven times and Jud.Cond.R. 1.3 five times. Jud.Cond.R. 1.2 says that "[a] judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." And Jud.Cond.R. 1.3 prohibits a judge from "abus[ing] the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow[ing] others to do so."

{¶ 91} Start with Jud.Cond.R. 1.3. The board found that in the run up to the Tea Party meeting, Judge Grendell "abuse[d] the prestige of judicial office to advance the personal or economic interests of" Laurie and Miller in violation of Jud.Cond.R. 1.3 three times: (1) when he approached Lt. Duncan outside, in his

robe, and told him that he was going to put on an order saying that Laurie and Miller could enter the public auditor's office to do court business and that anyone who interfered with that order would be held in contempt; (2) when he visited Chief Niehus to explain his intended order and express concern about possible § 1983 liability if law-enforcement officers interfered with Laurie and Miller carrying out the court's business; and (3) when he called Police Prosecutor Gillette to do the same. The board found that after the Tea Party meeting, Judge Grendell violated Jud.Cond.R. 1.3 two more times: (4) when he reached out to Gillette to ask whether a special prosecutor had been appointed to investigate the June 27 incident; and (5) when he asked Chief Niehus the same at a rotary-club fundraiser. The board concluded that in each instance, he was throwing the weight of his judicial office around to influence a possible investigation into his staff. But the record indicates that he was not acting to advance the *personal or economic interests* of himself or others. Rather, he was acting in what he perceived to be the interests of the probate court.

{¶ 92} Recall what happened. Judge Grendell did not himself get involved in the June 27 incident until his staff was engaged with Lt. Duncan, who was explaining to them the possibility of criminal trespass charges against them if they again entered the auditor's office. And while the volume of his voice is in dispute, the content of what he said is not: Judge Grendell suggested that he would have to enter an administrative order saying that his staff was allowed to enter the public area of the auditor's office to do the court's business if the auditor tried to bar them from entering, and anyone violating that order would be in contempt of court. He then explained the intended order to Gillette and Chief Niehus. And he informed them about the police department's potential § 1983 liability to his staff if their right to conduct court business in public was wrongfully interfered with. Much later, he asked Gillette and Chief Niehus whether a special prosecutor had been appointed to investigate the June 27 incident, got simple answers from them, and left it at that

without further conversation. There is no indication that Judge Grendell was furthering any interest other than the court's interest in doing court business.

{¶ 93} The board's contrary conclusions were abrupt and made with little to no analysis. Again, Jud.Cond.R. 1.3 prohibits a judge from abusing the prestige of his office "to advance the *personal or economic* interests of the judge or others." (Emphasis added.) In each instance, the board concluded with little more than a single sentence that Judge Grendell's actions were driven by a desire to intimidate various law-enforcement officers and derail a possible investigation into his staff. *See* Board Report at ¶ 211 ("[Judge Grendell's] threats to use his contempt powers in an effort to intimidate Duncan and the Chardon police department from investigating potential criminal charges against [his] employees was . . . [a] violation of Jud.Cond.R. 1.3."); *id.* at ¶ 214 ("[Judge Grendell's] actions were for the intended purpose of squelching the police department's investigation of potential criminal charges against Laurie and Miller"); *id.* at ¶ 216 ("[Judge Grendell's] unprecedented visit to the Chardon police department and his threats to Chief Niehus regarding contempt charges against anyone who interfered with his order, and a potential federal lawsuit against the police department, violated . . . Jud.Cond.R. . . . 1.3"); *id.* at ¶ 217 ("[Judge Grendell's] contact with Gillette . . . violated Jud.Cond.R. . . . 1.3."); *id.* at ¶ 240 ("[Judge Grendell's] inquiries of Gillette and Niehus violated Jud.Cond.R[.] . . . 1.3"). Other than simply saying so, neither the board nor disciplinary counsel explain how Judge Grendell's actions show that he was using his judicial office to advance the interests of Laurie and Miller, rather than the interests of the court.

{¶ 94} When Judge Grendell was explaining his intended order and the potential for a § 1983 action to Chief Niehus, Gillette, and Lt. Duncan, he was doing so because of the threat of future criminal trespassing charges against his staff if they entered the auditor's public office—a threat that would prevent them from carrying out court business. The record does not indicate that Judge Grendell was

aware of any pending or impending charges against Laurie and Miller for conduct stemming directly from the June 27 incident at the time. So he could not have been acting to derail any such investigation. And there is no indication that Judge Grendell was furthering any interest at all when he subsequently asked Chief Niehus and Gillette whether a special prosecutor had been appointed. He merely asked a question and received an answer. Neither the Board Report nor disciplinary counsel offer any explanation as to how that violates Jud.Cond.R. 1.3—they just say that it does. We disagree. Asking a question, receiving an answer, and then disengaging generally doesn't further any interest other than simply gaining information.

{¶ 95} All this to say: disciplinary counsel has not established by clear and convincing evidence that Judge Grendell violated Jud.Cond.R. 1.3 by "abus[ing] the prestige of judicial office to advance the personal or economic interests of" Laurie and Miller before or after the Tea Party meeting.

{¶ 96} The same goes for Jud.Cond.R. 1.2. The board found that in the time before the Tea Party meeting, Judge Grendell violated Jud.Cond.R. 1.2—which requires judges to "act at all times in a manner that promotes the public confidence in the independence, integrity, and impartiality of the judiciary, and . . . avoid impropriety and the appearance of impropriety"—five times: (1) when he explained to Lt. Duncan his intended order and the consequences if anyone violated it; (2) when he explained the order and potential § 1983 liability to Chief Niehus; (3) when he did the same to Gillette; (4) when he sent his letter to Walder; and (5) when he sent his apology letter to Lt. Duncan. The board found that after the Tea Party meeting, Judge Grendell violated Jud.Cond.R. 1.2 twice more: (6) when he asked Gillette about the special prosecutor and (7) when he asked Chief Niehus about the special prosecutor. In each instance, the board concluded that Judge Grendell failed to avoid impropriety or the appearance of impropriety. But the record does not support those conclusions.

{¶ 97} The board's legal findings of rule violations were again conclusory and made with little analysis. It seems to have focused on Judge Grendell's explanations of his intended order and of potential § 1983 liability, repeatedly characterizing them as "threats" to various law-enforcement officials. To be sure, Judge Grendell can be faulted for embroiling himself in a messy political dispute with Walder. But we are hard-pressed to find that his actions constituted violations of Jud.Cond.R. 1.2. To start, there is nothing in the record that suggests that Judge Grendell's intended order would be improper. The court had business to do in the auditor's public office, and disciplinary counsel does not argue that it would be wrong for Judge Grendell to put on an order saying that court staff could conduct court business in a public place. Further, being held in contempt of court is a well-known consequence of violating a court order. Judges don't "threaten" people when they inform them that violating a court order would constitute contempt of court.

{¶ 98} With respect to a potential § 1983 action, Judge Grendell had no threat to make. Any possible § 1983 liability would arise from the violation of Laurie's and Miller's rights, not Judge Grendell's. If anybody could have made a threat of a future § 1983 action, it would have been Laurie or Miller. And finally, neither the Board Report nor disciplinary counsel explain what was improper about Judge Grendell merely asking Gillette and Chief Niehus whether a special prosecutor had been appointed. For all these reasons, disciplinary counsel failed to establish that Judge Grendell's actions constituted violations of Jud.Cond.R. 1.2.

{¶ 99} These conclusions do not mean that we condone Judge Grendell's actions following the June 27 incident. There are many things that he could have done differently. Even (and perhaps especially) when conducting court business, judges must be aware of how their actions are perceived publicly and privately. But we are not deciding whether Judge Grendell acted perfectly here. We are deciding whether disciplinary counsel has established by clear and convincing evidence that

Judge Grendell violated the Code of Judicial Conduct. We conclude that he has not.

### III. COUNT 1: THE GLASIER MATTER

{¶ 100} The Glasier matter arose out of a highly contentious child-custody case that Judge Grendell agreed to accept from the domestic-relations court. The underlying issue was that three teenage children refused to see their father, despite an agreed judgment entry that provided for reunification of the children and their father. After unsuccessfully trying to achieve reunification through therapeutic counseling, Judge Grendell ordered two of the children to attend visitation with their father. When they refused to attend, Judge Grendell ordered that they be held in juvenile detention over a weekend. The board concluded that Judge Grendell committed a variety of disciplinary violations in his handling of the matter.

{¶ 101} Judge Grendell has raised various objections to the board's findings and legal conclusions, and we sustain in part and reject in part his objections. The board in large part premised its findings on its disagreement with Judge Grendell's interpretation and application of the law and with his discretionary decisions. But as we will explain, the ordinary remedy for a legal error committed by a judge is an appeal, not discipline. A legal error or an abuse of a judge's discretion is not by itself a sufficient basis for discipline; rather, to rise to the level of a disciplinary violation, there must be a showing that the judge willfully failed to follow the law. Thus, we sustain several of Judge Grendell's objections to the board's findings and legal conclusions. We conclude, however, that Judge Grendell did violate the Code of Judicial Conduct and sustain in part the board's conclusion that Judge Grendell violated Jud.Cond.R. 1.2, 2.2, and 2.11.

### A. Facts

{¶ 102} The facts of the Glasier matter are complicated. They arise out of Judge Grendell's decision to accept the transfer of an extremely difficult child-custody matter from the domestic-relations court. The board's findings of

disciplinary violations center on its conclusion that on May 29, 2020, Judge Grendell improperly ordered two boys held in a juvenile detention center for refusing to attend visitation with their father. But it also found that he committed disciplinary violations (1) at a May 27, 2020 hearing in which he ordered the boys to attend visitation with their father, (2) at a June 1 proceeding that was held after the boys were released from the detention center, (3) through his handling of various matters in the case relating to diversion and unruly charges against the boys between June 1 and June 30, and (4) in connection with a GoFundMe web page that had been established to assist the boys' mother.

### 1. Background: Judge Grendell accepts a difficult case from the domestic-relations court

{¶ 103} Judge Grendell had never received a case from the domestic-relations court. One day in 2019, that changed. Domestic-relations-court judge Carolyn Paschke emailed Judge Grendell to ask if he would consider accepting the transfer of a "heavily contested" domestic-relations case that had been in the domestic-relations court since 2015. She explained that a clinical psychologist, Dr. Farshid Afsarifard, had "conducted a custody evaluation and found parental alienation." And while one year earlier the parties had entered into an agreed entry (the "Agreed Entry") intended to reunite the children with their father, the court had been unable to enforce the Agreed Entry because the "3 children [were] refusing to see their father or Skype with him." As a result, the father had been denied contact with his children. She implored Judge Grendell:

> We are out of resources and authority on this one. The fact that Dr. Afsarifard found parental alienation and dad has not been restored to any type of meaningful contact with the children is both alarming and disappointing. I was thinking that perhaps in Juvenile Court you might have the authority to require the children to meet

with their father in a safe, therapeutic setting and further you might have the resources in place to reunify the father with the children in some meaningful way.

Judge Grendell agreed to accept the case. He later described it as one of the most difficult cases he ever presided over.

{¶ 104} The case that Judge Grendell agreed to accept involved Stacy Hartman and Grant Glasier, who had divorced in Florida in 2010. They had three minor children—a daughter born in 2003, a son born in 2004, and a son born in 2006. Under their 2010 judgment of dissolution of their marriage, Hartman was awarded primary custody of the children and Glasier had visitation rights. Hartman and the children subsequently moved to Ohio, and later, in an effort to have more time with his children, Glasier moved to Ohio as well.

{¶ 105} But in February 2017, an incident occurred that led the children to refuse to see Glasier. The Agreed Entry, which was entered into in August 2018, was designed to reunify the children with their father. Hartman and Glasier agreed that the children would begin reunification efforts with their father through a process that included individual counseling for Glasier and family counseling for Glasier and the children. The parties further agreed that "the ultimate goal through counseling is to implement the Court's standard parenting guidelines, at a minimum, with more to be allowed with recommendation by family counselor, parents and children." The Agreed Entry established "a goal of standard parenting being implemented within 180 days or as soon as determined by the family counselor."

{¶ 106} When Judge Paschke asked for Judge Grendell's help in 2019, the boys had not attended visitation with Glasier for a year and a half, despite the Agreed Entry. After agreeing to accept the case, Judge Grendell reviewed the report from the clinical psychologist, Dr. Afsarifard, that Judge Paschke had referred to in

her email. The report served as the premise of the Agreed Entry, with the Agreed Entry largely adopting Dr. Afsarifard's recommendations. In his report, Dr. Afsarifard wrote that "the children ha[d] been through a number of significant stressors and their interactions with their father had not always been rewarding." He explained that even though there was evidence that they had once had a good relationship with their father, they were unwilling to acknowledge as much, and "[t]hey were heavily entrenched in their view that their father was an abusive, alcoholic individual, who should be out of their lives." Dr. Afsarifard attributed some of the blame for the situation on the children's mother. He found it "obvious that [the children] had been empowered by their mother to 'make decisions' as to whether or not they wanted to have a relationship with their father." He noted that when asked directly, neither the mother nor her boyfriend "seemed to be willing to support an effort to reunify the children with their father." He also explained, "It is clear that based on some direct experience of their own with their father, and negative influence from their mother and [her boyfriend], the children have become seriously alienated from their father."

{¶ 107} Dr. Afsarifard recommended that the children remain in the custody of their mother, that the children participate in therapeutic visitation with their father, and that within 90 days of the commencement of the therapeutic work that consideration be given to extending the children's time with the father with the goal that within a few months, the children would have standard visitation time with their father. Dr. Afsarifard emphasized that this "process need[ed] to be supported by the children's mother" and that "[c]onsideration should be given to consequences for [her] if she d[id] not . . . support this plan." He also suggested that while "there [were] no clinical indications that [Glasier] had an alcohol abuse problem, he should abstain from drinking in order to remove any questions regarding this issue." He concluded by stating that none of the children's experiences with Glasier justified terminating his parental rights and that

"[a]llowing the children to make decisions that involve eliminating a parent out of their lives can have serious negative psychological consequences and should not be a consideration."

{¶ 108} After accepting the transfer in August 2019, Judge Grendell and his staff undertook to implement the Agreed Entry. Judge Grendell's magistrate arranged for therapeutic visitation to be facilitated by Ohio Guidestone, a service provider who often worked with the juvenile court. This effort was unsuccessful because the children refused to see their father and the provider was unwilling to force them to participate. When that didn't work, the court tried a different approach. The court's case manager met with the children, who expressed their adamant opposition to seeing their father. The case manager determined that it might be helpful to take some pressure off the children and work directly with the parents. At the case manager's suggestion, in December 2019, the magistrate issued an order suspending visitation and directing the parents to meet weekly with the case manager. Unfortunately, this effort proved to be unsuccessful as well.

{¶ 109} Glasier ultimately filed objections to the magistrate's order suspending visitation and also filed a motion to modify custody and child support. In support of his motion, he cited the failure to implement the terms of the Agreed Entry. He asserted that it was in the best interest of the children that he be named residential parent and legal custodian and that "if the children remain[ed] with [their mother], further alienation w[ould] just continue to occur."

{¶ 110} Judge Grendell held a status hearing on the motion and other related matters on January 28, 2020. At the hearing, Judge Grendell emphasized that he viewed the court's function as "to help facilitate both parents to encourage the children to have a loving and bonded relationship with both parents." He noted the difficulty of the situation and expressed the view that for reunification to be successful the family needed to work with a "high-priced" and "really skillful" therapeutic specialist. He opined that he did not think it would be helpful to force

the children to see their father until such a professional was in place. He also expressed his determination to achieve reunification, promising that if he needed to, he would "attend every damn visitation session for the first couple months" and that he was "not throwing in the towel."

{¶ 111} Following the January 28 hearing, Judge Grendell asked for assistance from court staff in identifying potential candidates to facilitate therapeutic visitation. Ultimately, he selected Dr. Stephen Neuhaus as the professional who was best suited to work with the family on reunification. Judge Grendell had prior experience with Dr. Neuhaus and considered him "the nuclear option for parental alienation matters," someone who "was able to get past the obstinance of the alienated juveniles and get the job done." Judge Grendell ordered the parents to split the $1,500 initial retainer for Dr. Neuhaus's services. Unfortunately, these efforts to restart therapeutic visitation stalled.

{¶ 112} On April 20, Judge Grendell conducted a telephonic hearing with the parents in which he inquired about the status of the work with Dr. Neuhaus. The hearing continued the next day with the parties appearing in person. Hartman represented that she was unable to afford the cost of Dr. Neuhaus's services, explaining that she was a stay-at-home mom who had not been employed since 2013 and that Dr. Neuhaus was not covered under her children's health insurance. She also told the court that they had tried reunification therapy, and it had not worked. Judge Grendell explored the idea of Glasier paying the full cost of the therapy, but Glasier resisted, telling the court that he believed that Hartman could afford the cost and that unless Hartman had some financial commitment, she would frustrate efforts to proceed with therapeutic visitation.[6]

{¶ 113} Judge Grendell also had some tough talk for both parents:

---

6. According to Judge Grendell, he also considered having the court pay Hartman's share, but Dr. Neuhaus told him that that he wouldn't undertake the work unless both parties had a financial stake in the outcome.

So, dad, you're going to have to cut the crap, the threats, and you're going to have to act like a grown-up father. And mom, you're going to have to act like a mother who wants the children to have a relationship with their father.

{¶ 114} Before the second day of the hearing, Judge Grendell conducted in-camera interviews with the children. Judge Grendell made an effort to connect with each of the children, asking them about their interests and their studies. All three children expressed an unwillingness to have a relationship with their father. The daughter was the most adamant, calling her father "[m]entally abusive, physically abusive, [and] religiously abusive." The daughter also expressed a strong resistance to family counseling, explaining that she had been better off since she had stopped going to therapy sessions. Judge Grendell explained that his role was "to uphold the parental rights of the parent and protect the best interests of the child." He told the daughter that the law did not allow children to make a unilateral decision not to see their father. He acknowledged that the situation with the daughter was more difficult because she would turn 18 in less than a year and be able to make her own decision about having a relationship with her father, but he told her that she would need to participate in the counseling process until then. After meeting with the children, Judge Grendell told the guardian ad litem, who had been present for the interviews, that he needed a few minutes to think about how to best proceed.

{¶ 115} Judge Grendell returned to the bench and heard from both parents. He then announced that he would adjust his order about Dr. Neuhaus because of Hartman's financial concerns. He ordered that Hartman pay $500 of the initial retainer and Glasier $1,000. He directed that the money be paid within 15 days and the therapy sessions be started as "immediately as possible thereafter."

### 2. The May 27 hearing

{¶ 116} Despite Judge Grendell's order, therapeutic visitation had not begun by the time the parties next appeared in front of him on May 27. The hearing date had initially been set on Glasier's motion to modify custody and child support, but the day before the hearing, Glasier contacted Hartman to say that he would not be going forward with the motion.

{¶ 117} Judge Grendell began the hearing by asking Glasier whether there had been progress with Dr. Neuhaus. Glasier told Judge Grendell that he had spoken to Dr. Neuhaus the day before and that Dr. Neuhaus had said that he did not think the treatment would be able to go forward because Hartman was unable to afford the cost. Judge Grendell asked Hartman if she had paid the $500 as he had ordered. Hartman replied that Dr. Neuhaus had agreed to let her pay $100 per month and that she had paid an initial $100 and would pay him that amount monthly.

{¶ 118} Glasier then explained that he planned to follow Dr. Neuhaus's recommendation and that he wanted to withdraw his motion for change of custody and support. Judge Grendell asked Glasier about his current visitation status, and Glasier responded that he had not seen his children in over three and a half years.

{¶ 119} At this point, Judge Grendell told Glasier he would convert his motion to modify custody into "an order seeking to enforce [his] right to parenting time with the children." Hartman tried to explain why she believed it would be inappropriate to allow Glasier to resume his parenting time with the children, reading a letter to the court in which she argued that the case was "not about the three children, parental alienation or visitation" but "about a man that needs to be in control." She also pointed to a recent guardian ad litem report, which she said recommended that everything should remain the same.

{¶ 120} Judge Grendell told Hartman that he was not going to relitigate the past. "We're not going backwards," he said. "[W]hat I care about under Ohio law

is that the children are best situated when they have a loving and bonded relationship with both parents, and it requires the opposite parent to encourage the children to have that loving and bonded relationship," he continued. He also intimated that Hartman was the reason why the boys had been refusing visitations with Glasier. He told Hartman, "The record in front of me does not speak well for your encouragement, ma'am."

{¶ 121} Judge Grendell found therapeutic visitations to be a lost cause in the case, telling Glasier: "That train's left the station. There ha[ve] been efforts by me and others to get you reconciliation and counseling. That would have been better for everybody including your children, but apparently that's just not going to happen."

{¶ 122} Judge Grendell then announced that Glasier would receive visitation with the two boys on alternating weekends, beginning that weekend. He directed that visitation transfers occur at the sheriff's office and that the court's constable would be present to ensure that the transfer went smoothly. He also explained that the constable would remain for the first hour of the visitation and that the boys would have the constable's cell-phone number and should call him if there was any issue during visitation. Judge Grendell told Hartman, "You will do everything positive to enforce [visitations], you will not fuel the children, you will not tell the children they should call you." And he warned her that any "shenanigans" would lead to "some serious discussion about jeopardizing one's custody in this case."

{¶ 123} Before Judge Grendell announced his visitation order, Hartman had told the court that in preparation for the hearing on the motion to modify custody she had prepared binders with evidence showing that she had "cooperated and . . . encouraged the children [to visit their father]." After announcing his decision, Judge Grendell told Hartman that she was welcome to give the court the binders

"as evidence . . . for the record." He also informed Glasier, "[Y]ou're welcome to object or not. There's probably a lot of hearsay in there." Glasier objected.

{¶ 124} Judge Grendell asked Hartman about the contents of the binders. Hartman responded that the binders contained "reports from the family counselor, the Guardian ad Litem reports," and "threats that were made during reunification therapy." Judge Grendell sustained Glasier's objection, saying "everything you have described to me, with rare exception, is hearsay and wouldn't be admissible unless there was a live body to testify to it." Nonetheless, he allowed Hartman to submit the binders for purposes of the record.

### 3. *Attempted visitation and detention of the two boys*

{¶ 125} Two days later—Friday, May 29—Hartman dropped off the boys with the constable as ordered. When Hartman left, the constable was convinced that the visitation would be successful because of the calm demeanor of the boys. But eventually the boys began fidgeting, and their nervousness became apparent. The older boy began indicating that he and his brother would not go with Glasier for the weekend.

{¶ 126} Worried that the visitation would fall through, the constable contacted Judge Grendell by telephone. Before the panel in this case, Judge Grendell said that he told the constable to call Hartman and tell her to again instruct the boys to attend the visitation. Judge Grendell testified that it was his recollection that the possibility of detaining the boys did not come up in this first call. But Judge Grendell's actions after the call with the constable suggest otherwise. After the call, Judge Grendell immediately called the juvenile court's director of probation to inform her that two children were being placed in detention for unruliness based on their refusal to attend visitation. Judge Grendell told the director that the children were not allowed contact with Hartman during the detention and that the detention would last from Friday night until noon on the following Monday, when he would hold a hearing on the matter.

{¶ 127} The constable's actions also suggest that Judge Grendell initiated the decision to detain the children on unruly charges. After the call with Judge Grendell, the constable called the sheriff's office. The constable testified that he could not remember why he called the sheriff's office but that the only reason he would call the sheriff's office at that time would be to take the boys into custody. A court case manager, who was at the attempted visitation, also testified that the constable had not mentioned detention before his first call with Judge Grendell.

{¶ 128} The constable entered the sheriff's office with the two boys, and a sheriff's deputy was summoned to assist the constable. The constable informed the sheriff's deputy that if the boys refused to attend the scheduled visitation with their father, they would be detained. The deputy later testified that he had been uncomfortable with the situation because he did not think that failing to attend visitation created probable cause to detain the boys.

{¶ 129} The constable then called Hartman on speaker phone from the sheriff's office. He informed Hartman that the boys were refusing to go with Glasier and that Judge Grendell had ordered the boys to be detained if they refused to go. Hartman tried to convince the boys to go with Glasier. The older boy said that he would rather be put in detention. The younger boy remained silent. Hearing the older boy's response, the constable told Hartman that the boys were going to be charged as unruly and detained. He then ended the call.

{¶ 130} After finishing the call with Hartman, the constable again called Judge Grendell, who authorized the detention of the boys. The constable and deputy filled out juvenile fact sheets for the boys. Under the section titled "Charge," the deputy wrote on the older boy's fact sheet: "Unruly Per Judge." The constable identified the younger boy's charge simply as "Unruly."

{¶ 131} The deputy transported the boys from the sheriff's office to a detention center. After dropping off the boys, the deputy filled out an incident report. In the report, he wrote that the constable had spoken with Judge Grendell

at the sheriff's office and that "[p]er Judge Grendell," he was to take the boys to the detention center. Judge Grendell directed that the boys be kept separate from the general population and separate from each other.

### 4. The June 1 post-detention proceedings

{¶ 132} The boys spent that weekend in the detention center with no communication with their parents, although their priest was allowed to visit. The following Monday, June 1, Judge Grendell ordered that the boys be brought to the juvenile court for a noon detention hearing. While the boys waited in a separate room, Judge Grendell and the two attorneys who were representing the boys met in the courtroom.

{¶ 133} Hartman had retained one of the attorneys to represent the boys, but Judge Grendell told him that the court would appoint him as counsel for one boy at the court's expense and that Hartman could use the money she was going to spend on him for Dr. Neuhaus's fees for reunification counseling. He appointed separate counsel for the other boy. After giving the attorneys some background on the child-custody case, Judge Grendell announced that he was going to process the case informally under Juv.R. 9(A), which allows the juvenile court "[i]n all appropriate cases" to avoid "formal court action" through "other community resources . . . to ameliorate situations brought to the attention of the court." He said, "I don't want unruly charges on these kids." Rather, his goal was that the children "have at least initially therapeutic visitation with their dad and . . . some counseling, [that] they would go through the Neuhaus process that [he had] tried to get them into." He also expressed frustration about what he viewed as Hartman's refusal to "embrac[e] the process and encourag[e] the children to have a relationship with [Glasier]." He stated that he intended to put on another order requiring Hartman to pay the remainder of her share of Neuhaus's retainer, explaining that "Neuhaus is convinced that if [Hartman] doesn't have some vig in the game, it's a waste of his time to try to do anything." He concluded by telling the attorneys that he had signed

an order releasing the children and requiring them to follow all parenting time as ordered. After leaving the courtroom, Judge Grendell told the police sergeant who had transported the boys from the detention facility to release them to their mother.

### 5. June 1 to June 30

{¶ 134} After the boys' release, their counsel filed an emergency motion in the court of appeals to stay the May 28 judgment entry ordering the boys to attend visitation with their father. Glasier filed with the juvenile court a motion "to vacate the order of May 28th, 2020 in favor of an order granting standard parenting time to begin September 4, 2020."

{¶ 135} Without Glasier asking, Judge Grendell appointed Glasier an appellate attorney "for the limited purpose of responding to the motion for stay." Judge Grendell signed off on Glasier's appellate counsel being paid his regular rate of $225 per hour, rather than the standard court rate of $40 per hour. Conversely, Judge Grendell denied Hartman's requests for appointment of counsel twice.

{¶ 136} Meanwhile, Judge Grendell continued his effort to handle the matter informally through diversion. A diversion contract was prepared under which the boys and their parents were required to "complete the therapeutic assessment from Dr. Neuhaus and follow all recommendations." Successful completion of the contract would mean that no formal court action would be taken against the boys and the formal complaint would be immediately sealed and expunged. The contract required the signatures of both parents. Hartman, however, refused to sign the contract, explaining later that she "didn't think [her] boys were guilty of anything."

{¶ 137} Following the court's unsuccessful attempt at diversion, the court's constable filed formal unruly charges against the boys on June 11. On June 30, 2020, Grendell dismissed without prejudice the unruly charges against the boys and referred the matter back to diversion pursuant to Juv.R. 9.

### 6. The GoFundMe web page

{¶ 138} On July 8, 2020, the court of appeals granted Hartman's emergency motion to stay the May 28 judgment entry ordering visitation with Glasier. The court of appeals further noted that after Hartman filed her notice of appeal, Glasier filed a motion in the trial court to vacate the May 28 visitation entry. The appellate court remanded the case to Judge Grendell to rule on Glasier's motion.

{¶ 139} The remand hearing occurred on July 23. Before the hearing, a friend of Hartman had created a GoFundMe web page to raise money for Hartman to retain counsel. The GoFundMe web page was titled "Honor roll students incarcerated by Judge Grendell" and displayed a photo of Hartman and the boys at the top of the page. The web page criticized Judge Grendell's handling of the case and the detention of the boys, characterizing his actions as "a complete mockery and abuse of our judicial system."

{¶ 140} Hartman appeared with counsel at the July 23 hearing; Glasier appeared pro se. Glasier explained that he had moved to vacate the May 28 order because after the boys refused to go with him and were put in detention, he "realize[d] that they absolutely are not going to go unless they have the therapy that they need and the counseling in order to reunite and . . . redevelop a relationship with [him]." Judge Grendell vacated the May 28 order but also noted that Glasier's motion sought other relief including eventual standard parenting time with the boys. Judge Grendell stated that it was going to require a full evidentiary hearing to decide whether it was in the best interest of the children to have parenting time with Glasier. After discussing scheduling with counsel, Judge Grendell set an evidentiary hearing to begin on October 12.

{¶ 141} Before he left the bench, Judge Grendell turned to the GoFundMe web page. He announced that he was prepared to enjoin Hartman, and anyone connected to Hartman, from using the names or likenesses of the boys "in anything with the public in connection with these proceedings." He said, "[Hartman] can

say anything she wants about me, but "[s]he cannot use [the boys'] names or likenesses in the context of these proceeding[s] or the [u]nruly proceedings because then it's harmful to the best interests of the children." Hartman's counsel told Judge Grendell that her client would follow the judge's instructions. Judge Grendell also said he was going to ask Hartman at the October 12 hearing to address why the clerk shouldn't "claw back" the funds raised through the GoFundMe web page and use that money to reimburse the county for her and her sons' court-appointed attorneys. Judge Grendell spent the last few minutes of the hearing addressing what he considered the "many false statements" in the GoFundMe web page.

{¶ 142} Five days after the hearing, Judge Grendell called Hartman's attorney and told her that the picture of the children was still on the GoFundMe web page and asked for an explanation. (Hartman's attorney later testified that the reason the image had not been immediately removed was because Judge Grendell had not yet issued an order memorializing what he had said at the July 23 hearing and she was waiting "to see exactly what it said.") After speaking with Judge Grendell, the attorney called Hartman and told her that the picture needed to be removed.

{¶ 143} Despite being scheduled at the July 23 hearing, the October 12 evidentiary hearing never occurred. Instead, on September 16, 2020, Judge Grendell transferred the matter back to the domestic-relations court. With that, Judge Grendell's involvement in the Glasier matter came to a close.

### 7. The board's findings

{¶ 144} In connection with the Glasier matter, disciplinary counsel charged Judge Grendell with violating Jud.Cond.R. 1.2, 2.2, 2.9(A), 2.11, 2.11(A)(7)(c), and Prof.Cond.R. 8.4(d). Jud.Cond.R. 1.2 requires judges to act in "a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and [to] avoid impropriety and the appearance of impropriety." Jud.Cond.R. 2.2 requires judges to "uphold and apply the law, and [to] perform all

duties of judicial office fairly and impartially." Jud.Cond.R. 2.9(A) prohibits judges from "initiat[ing], receiv[ing], permit[ting], or consider[ing] ex parte communications," except in limited circumstances. Jud.Cond.R. 2.11(A) requires a judge to "disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." Division (7)(c) of Jud.Cond.R. 2.11(A) specifically requires the disqualification of a judge who "was a material witness concerning the matter [in controversy]." And Prof.Cond.R. 8.4(d) prohibits lawyers from "engag[ing] in conduct that is prejudicial to the administration of justice."

{¶ 145} The board found that Judge Grendell committed all the charged disciplinary violations in the Glasier matter. Specifically, the board found that Judge Grendell violated some combination of Jud.Cond.R. 1.2, 2.2, 2.9(A), and 2.11 and Prof.Cond.R. 8.4(d) in connection with (1) the May 27, 2020 hearing, (2) the attempted visitation and the detention of the boys, (3) the June 1 post-detention proceedings, and (4) his handling of the case from June 1 to June 30.

{¶ 146} The board did not specifically analyze how Judge Grendell's conduct violated any of the disciplinary rules charged. Rather, for each of the four relevant periods noted above, the board summarized Judge Grendell's conduct and his purported legal errors. Then, in a concluding, bare-bones summary paragraph, the board stated that it had concluded that Judge Grendell violated disciplinary rules. *See, e.g.*, Board Report at ¶ 100 ("The panel finds that [Judge Grendell's] actions during the May 27, 2020 hearing violated Jud.Cond.R. 1.2, 2.2, and 2.11, as well as Prof.Cond.R. 8.4(d).").

## B. Objections

{¶ 147} Judge Grendell raises two objections in relation to the Glasier matter. First, Judge Grendell objects that the board improperly recommended sanctions for a violation that was not certified to the board, violating Gov.Bar R. V(11). Second, Judge Grendell objects that the board erred in finding that he

committed disciplinary violations in his handling of the Glasier matter.  We sustain Judge Grendell's objections in part but conclude that Judge Grendell violated Jud.Cond.R. 1.2, 2.2, and 2.11 in connection with the Glasier matter.

## 1. *Judge Grendell cannot be disciplined for misconduct that was not certified to the board*

{¶ 148} Before a disciplinary matter is certified to the Board of Professional Conduct for a hearing, the disciplinary complaint is first investigated by a probable-cause panel.  Gov.Bar R. V(11)(A).  If the panel determines that there is probable cause for filing the complaint, it is certified to the board.  *Id.*  Any alleged violation for which probable cause has not been established is dismissed.  *Id.*

{¶ 149} Judge Grendell posits that the board erred by premising its conclusions in the Glasier matter on findings that he failed to follow applicable law.  He points out that the initial complaint against him alleged that he violated Jud.Cond.R. 1.1, which states that "[a] judge shall comply with the law."  However, the probable-cause panel did not find probable cause that he violated Jud.Cond.R. 1.1, so that violation was dismissed and not certified to the board.  We agree with Judge Grendell that it would be improper for the board to premise a disciplinary violation on a charge that was not certified to the board.  Doing so violates basic due-process principles of fair notice and is inconsistent with the Rules for the Government of the Bar.  *See, e.g.*, *Disciplinary Counsel v. Reinheimer*, 2020-Ohio-3941, ¶ 18-19 (rejecting on due-process grounds the board's findings that respondent committed rule violations that were not charged in the complaint).

{¶ 150} Judge Grendell points out that most of the board's findings in the Glasier matter were premised on its determination that Judge Grendell failed to follow or misapplied applicable law.  Indeed, the section of the Board Report in which the board concluded that Judge Grendell committed disciplinary violations in connection with the Glasier matter is titled "Respondent's Failure to Follow the Law Applicable to the Case."

{¶ 151} Disciplinary counsel contends that the board was not precluded from disciplining Judge Grendell for his purported legal errors. Disciplinary counsel argues that even though the probable-cause panel dismissed the Jud.Cond.R. 1.1 charge ("[a] judge shall comply with the law"), other rules provide a basis for discipline. Specifically, disciplinary counsel cites Jud.Cond.R. 2.2: "A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially." Also at issue is Prof.Cond.R. 8.4(d), a broad catchall provision that makes it misconduct for an attorney to "engage in conduct that is prejudicial to the administration of justice."

{¶ 152} We sustain Judge Grendell's objection in part. As an initial matter, the board cannot rely on the broad catchall provision in Prof.Cond.R. 8.4(d) to punish Judge Grendell for conduct that the probable-cause panel chose not to certify to the board. Any violation of the Code of Judicial Conduct might be considered to be conduct prejudicial to the administration of justice. But when the probable-cause panel has refused to certify a violation of a more specific provision, the board cannot rely on Prof.Cond.R. 8.4(d) to punish the judge for violation of the more specific provision that was not certified to it.

{¶ 153} As to Jud.Cond.R. 2.2, there is certainly some overlap between that provision and Jud.Cond.R. 1.1. Jud.Cond.R. 1.1 speaks of "comply[ing] with the law" and Jud.Cond.R. 2.2 of "uphold[ing] and apply[ing] the law." But they are not twins. Nor is one provision redundant of the other. They are separate provisions of the Code of Judicial Conduct, and they address different misconduct. Jud.Cond.R. 1.1 is titled "Compliance with the Law." It provides a general duty of a judge to comply with applicable laws. Jud.Cond.R. 2.2 is entitled "Impartiality and Fairness." It connects the duty of a judge to "uphold and apply the law" with the requirement that a judge "perform all duties of judicial office fairly and impartially."

{¶ 154} A violation of Jud.Cond.R. 2.2, then, requires more than noncompliance with the law; rather, to violate its terms, a judge must fail to "uphold and apply the law" and fail to "perform all duties of judicial office fairly and impartially." Thus, we agree with Judge Grendell that because he was not charged with a violation of Jud.Cond.R. 1.1, a finding that he failed to comply with Jud.Cond.R. 1.1's requirement that "[a] judge shall comply with the law" could not by itself be a basis for discipline.

{¶ 155} Rather, to discipline Judge Grendell for his purported legal errors, the board was required to find a violation of Jud.Cond.R. 2.2: "A judge shall uphold and apply the law, *and* shall perform all duties of judicial office fairly and impartially." (Emphasis added.)

### *2. The ordinary remedy for a legal error is an appeal*

{¶ 156} As part of his objections, Judge Grendell contends that the board erred by finding disciplinary violations in his handling of the Glasier matter. Noting, once again, that the board's findings on the Glasier matter were primarily based on its findings that he failed to follow applicable law, Judge Grendell goes through each of the purported legal errors identified by the board and argues that he correctly applied the law. He also argues that even if he committed a legal error, discipline is not an appropriate remedy for a simple error in law.

{¶ 157} The ordinary remedy for a legal error is an appeal. The law can be complex, and trial judges must make a vast number of discretionary decisions, often with only limited time to reflect. We rely on appellate courts, not the disciplinary system, to correct ordinary legal errors. Thus, we have "long held that 'a mere mistake in the exercise of judicial discretion by a judge is not and should never be the cause or subject of a disciplinary proceeding under' the judicial-conduct rules." *Disciplinary Counsel v. Gaul*, 2023-Ohio-4751, ¶ 44, quoting *Mahoning Cty. Bar Assn. v. Franko*, 168 Ohio St. 17, 30 (1958). Nor are "honest mistakes or misapprehensions of law" grounds for discipline. *Franko* at 35. In that vein, "'[t]he

remedy for mistakes of law or fact in individual cases is by appeal, or certiorari, or other proper proceeding.  A judge has a right to be wrong so far as any discipline by [a court is] concerned except as his decisions may be reversed or writs sustained.'"  (Bracketed text in original.)  *Gaul* at ¶ 44, quoting *In re Judges of Cedar Rapids Mun. Court*, 256 Iowa 1135, 1136 (1964).

{¶ 158} To discipline a judge for a legal error, more is required than a conclusion that the judge misinterpreted or misapplied the law.  Even egregious judicial errors, if made in good faith, are not an occasion for discipline.  As Comment [3] to Jud.Cond.R. 2.2 explains, "[w]hen applying and interpreting the law, a judge sometimes may make good-faith errors of fact or law.  Errors of this kind do not violate this rule."

{¶ 159} Though a good-faith legal error is not grounds for discipline, we may appropriately discipline a judge for conduct that "demonstrate[s] a willful failure to follow the law," *Disciplinary Counsel v. Hoover*, 2024-Ohio-4608, ¶ 76.  This standard is reflected in our Rules for the Government of the Judiciary, which provide that a "willful breach" of the Code of Judicial Conduct may be punished by judicial discipline.  Gov.Jud.R. I(1).  As the Michigan Supreme Court recently explained,

> [a] decision to willfully ignore the law is the antithesis of a decision made in "good faith."  That is, a legal decision that is not made in "good faith" reasonably implies that a judge has knowledge of the law but refuses to acknowledge his or her duty or obligation to apply that law.  This refusal cannot be considered faithful to the law.

*In re Gorcyca*, 500 Mich. 588, 617 (2017).

{¶ 160} Our caselaw is in accord with this general principle that a good-faith legal error is not a basis for judicial discipline, but a willful failure to follow

the law may be.  In *Hoover,* we disciplined a judge for violations that involved judicial bias and a willful failure to follow the law in 16 separate cases in which the judge improperly threatened defendants with incarceration to collect fines and costs.  *Hoover* at ¶ 186-187.  In doing so, we noted that Hoover "ignored the applicable law," *id.* at ¶ 31, "did not make a good faith-effort to follow the law," *id.* at ¶ 43, 103, admitted that he did not follow an applicable statute because it "d[id] not work effectively for him," *id.* at ¶ 65, and "demonstrate[d] a willful failure to follow the law," *id.* at ¶ 76.

**{¶ 161}** In *Gaul*, we disciplined a judge for a variety of misconduct, including coercing defendants to plead guilty, making demeaning comments to criminal defendants and others in his courtroom, and improperly using his position as a judge to help a convicted criminal's effort to overturn a federal conviction.  *Gaul*, 2023-Ohio-4751, at ¶ 4, 31-32.  At the same time, however, we sustained Gaul's objection to a board finding that he had violated the Code of Judicial Conduct by improperly denying bond to a defendant.  *Id.* at ¶ 42, 50, 97.  We noted that while Gaul conceded to committing legal errors and had been reversed by the court of appeals, "[t]hese legal mistakes, despite their needing to be corrected on appeal, [did] not warrant disciplinary action."  *Id.* at ¶ 47.

**{¶ 162}** Thus, our precedent establishes that while a good-faith legal error is not a basis for judicial discipline, a willful failure to follow the law may give rise to a disciplinary violation.

**{¶ 163}** The board found that Judge Grendell committed multiple legal errors in his handling of the Glasier matter.  But as we explained in *Gaul*, "we cannot let the mound of [alleged] violations obscure our vision."  *Id.* at ¶ 45.  Rather, "[w]e must carefully comb through [the judge's] conduct and identify his exercises of judicial discretion that would be or were better dealt with through the appellate process and that do not amount to violations of the Code of Judicial Conduct or Rules of Professional Conduct."  *Id.*  Thus, we cannot follow the board's lead by

lumping together Judge Grendell's discretionary decisions and interpretations of law in various phases of the case and then simply announcing without analysis that there has been a violation of multiple disciplinary rules. In order to find a disciplinary violation, we must examine specific conduct and determine whether that conduct violates the terms of a specific disciplinary rule. In doing so, we are mindful that the rules in the Code of Judicial Conduct "should not be interpreted to impinge upon the essential independence of judges in making judicial decisions." Jud.Cond.R., Scope [5]. We are also cognizant that while "the rules [are] binding and enforceable, it is not contemplated that every transgression will result in the imposition of discipline." *Id.*, Scope [6].

### 3. *We conclude that Judge Grendell violated Jud.Cond.R. 1.2, 2.2, and 2.11 in connection with the Glasier matter*

{¶ 164} We turn now to Judge Grendell's objection that the board erred in finding that he committed disciplinary violations in connection with the Glasier matter. As we have previously noted, the board, for the most part, did not tie each of its findings of rule violations to specific conduct by Judge Grendell that constituted a violation of the applicable rule. Rather, its report sets forth Judge Grendell's conduct in various aspects of the case and then announces in a conclusory fashion that Judge Grendell's conduct constituted a violation of multiple rules. We have independently reviewed the record to determine if each charged violation is supported by Judge Grendell's conduct in the Glasier matter. Upon independent review, we conclude that Judge Grendell violated Jud.Cond.R. 1.2, 2.2, and 2.11.

#### i. Jud.Cond.R. 2.2

{¶ 165} Jud.Cond.R. 2.2 requires a judge to "uphold and apply the law, and . . . perform all duties of judicial office fairly and impartially." We conclude that Judge Grendell violated this rule based on his conduct surrounding his order that the boys be held in detention for their failure to attend visitation with their father.

{¶ 166} Throughout the disciplinary proceeding, Judge Grendell maintained that the unruly charges had been prepared by the constable on the constable's own initiative and that he had simply approved the boys' subsequent detention. The board concluded that Judge Grendell directed that the constable draft the charges. Judge Grendell has not made a separate objection to this finding, and we conclude that the board's finding is supported by the record.

{¶ 167} In Judge Grendell's view, there was a proper basis to detain the boys because they disobeyed their mother's order to attend visitation. He contends that by so doing, they fell within the statutory definition of an "unruly child." *See* R.C. 2151.022(A). That provision defines "unruly child" to "include[] . . . [a]ny child who does not submit to the reasonable control of the child's parents, teachers, guardian, or custodian, by reason of being wayward or habitually disobedient." Neither "wayward" nor "habitually disobedient" is defined by statute.

{¶ 168} Judge Grendell cites cases from the courts of appeals that demonstrate that children have been charged and adjudicated unruly for not complying with parental visitations. The caselaw bears out a pattern. In cases in which children have refused to attend court-mandated visitations with parents, unruly charges have been brought when the child (1) physically prevented the parent from exerting control, for example, by running away; (2) refused to attend visitation multiple times; or (3) both. *See Jones v. Jones*, 2021-Ohio-1498, ¶ 29 (4th Dist.) (refusing visitations multiple times); *Bohannon v. Bohannon*, 2020-Ohio-1255, ¶ 22 (9th Dist.) (taking the bus without permission to avoid parent and refusing visitations multiple times); *Doerman v. Doerman*, 2002-Ohio-3165, ¶ 9 (12th Dist.) (running away from home, being charged unruly, then continuing to refuse visitations); *In re Jennings*, 1997 WL 34967, *2, 5 (2d Dist. Jan. 31, 1997) (running away and leaving court-ordered visitation with parent without permission); *In re Puleo*, 1979 WL 208197, *1 (11th Dist. Oct. 9, 1979) ("habitually refusing to cooperate with visitation guidelines set down by the Court").

{¶ 169} We find nothing in the record that would support the filing of unruly charges against the boys. First, it is not clear from the record that the boys disobeyed an order from their mother to attend visitation. Hartman testified that before arriving at the sheriff's office, she had no need to order the boys to attend visitation because she did not believe they would refuse. Later, at Judge Grendell's direction, his constable called Hartman and asked her to tell the boys to attend visitation. But the record makes clear that this occurred after Judge Grendell had already told authorities at the juvenile facility that the boys were being detained. Further, even if we assume that Hartman did order the boys to attend visitation with their father, the record does not support a finding that they were "habitually disobedient."

{¶ 170} More significantly, though, even if we were to assume that unruly charges were warranted, there was no basis to take the boys into custody and detain them in the juvenile detention center. Judge Grendell stated that he made the decision to detain the boys based on Dr. Afsarifard's opinion that "the continuation of the termination of the relationship with the father . . . would cause . . . serious psychological harm." Juv.R. 6 limits the circumstances under which a child may be taken into custody. *See also* R.C. 2151.31(A)(3). And Juv.R. 7(A) states that a child who is taken into custody "shall not be placed in detention . . . prior to final disposition" except in limited circumstances. Relevant here, a court officer may take a child into custody when "[t]here are reasonable grounds to believe that the child is in immediate danger from the child's surroundings and that the child's removal is necessary to prevent immediate or threatened physical or emotional harm." Juv.R. 6(A)(3)(b); R.C. 2151.31(A)(3)(b). And a child who has been taken into custody may be placed in detention when necessary "[t]o protect the child from immediate or threatened physical or emotional harm." Juv.R. 7(A)(1)(a). Here, while Judge Grendell may have believed that the boys would suffer long-term emotional harm if they did not reconnect with their father, there is nothing to

suggest that the children were in "*immediate* danger from [their] surroundings," (emphasis added) Juv.R. 6(A)(3)(b). Indeed, Judge Grendell's constable later testified that the boys were not in any immediate danger—physical or emotional—when they were taken into custody at the sheriff's office.

{¶ 171} We are also troubled by Judge Grendell's order that the boys have no contact with their mother while in the juvenile detention center. Juv.R. 7(J) provides that "[a] child may telephone the child's parents and attorney immediately after being admitted to a shelter or detention facility and at reasonable times thereafter" and that a parent may visit "at reasonable visiting hours." Judge Grendell defended his no-contact order by asserting his authority under Juv.R. 13 to make temporary orders pending the hearing on the complaint. *See* Juv.R. 13(A) (allowing court to make temporary orders "as the child's interest and welfare may require"). But the only basis for the order that we can discern was Judge Grendell's belief that preventing the boys from talking to their mother would make it more likely that they would relent and agree to attend visitation with their father.

{¶ 172} Our disagreement with Judge Grendell's assessment of whether unruly charges were warranted, however, is not by itself a basis for discipline. Nor is our disagreement with his legal conclusion that there was a proper basis to take the boys into custody and detain them in the juvenile detention center. But here, the record shows more than good-faith errors of law. Rather, the picture that emerges is of a judge who had a strong belief that parental visitation was in the best interests of the children and who was legitimately frustrated by the failure of other means to achieve reunification between the boys and their father. But that frustration mounted to the point that Judge Grendell used the threat of detention—and when that failed, actual detention—in an attempt to coerce the boys to attend visitation with their father. He used his constable to orchestrate the filing of trumped-up charges and ordered the boys detained on those charges with little basis. In doing so, he willfully turned a blind eye to legal safeguards designed to protect

the best interests of children and avoid unnecessary detentions. We do not question Judge Grendell's good faith in believing that visitation with their father was in the children's best interests. But the means that he employed to accomplish that end evince both a conscious disregard for the law and a failure to impartially perform his duties. We conclude that his conduct constituted a violation of Jud.Cond.R. 2.2.

*ii. Jud.Cond.R. 2.11*

{¶ 173} Jud.Cond.R. 2.11(A) requires a judge to disqualify himself in any proceeding in which his impartiality might reasonably be questioned. The record in this case demonstrates that Judge Grendell may have taken on the Glasier case with the best of intentions but that over the course of the case, he lost his objectivity to such an extent that he could no longer be impartial. At the May 27 hearing, for example, Judge Grendell sua sponte converted Glasier's motion to modify custody into a motion to enforce parenting time and then ruled on the motion without providing Hartman any chance to respond. At the very least, it is clear that after he improperly ordered the boys held in detention over the May 29 weekend, he could not continue to impartially adjudicate the custody proceedings involving the boys. Indeed, Judge Grendell's subsequent conduct in appointing an attorney for Glasier to defend his visitation order in the appellate court and ordering that attorney paid at well above the normal rate—while not appointing counsel for Hartman—further highlights that by this point, Judge Grendell had lost his ability to be fair and impartial. Thus, we hold that Judge Grendell violated Jud.Cond.R. 2.11 in connection with the Glasier matter.[7]

---

7. The board purported to find a violation of both Jud.Cond.R. 2.11 and Jud.Cond.R. 2.11(A)(7)(c). Jud.Cond.R. 2.11(A) imposes a general duty on a judge to disqualify himself when his impartiality might reasonably be questioned. The board then, through "including but not limited to" language, detailed specific circumstances in which a judge's impartiality might reasonably be questioned and recusal required. One of these circumstances is set forth in Jud.Cond.R. 2.11(A)(7)(c), which states, "The judge was a material witness concerning the matter." Thus, properly understood, Judge Grendell's failure to recuse constitutes a single violation of Jud.Cond.R. 2.11, rather than a violation of two different rules.

### iii. Jud.Cond.R. 1.2

{¶ 174} Jud.Cond.R. 1.2 requires judges to act in "a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and [to] avoid impropriety and the appearance of impropriety." We conclude that the record supports a finding of a violation of Jud.Cond.R. 1.2. As we have explained, it is clear that as the Glasier matter progressed, Judge Grendell lost his ability to be fair and impartial. Improperly ordering two teenage boys to spend a weekend in detention is not an act that instills public confidence in the impartiality of the judiciary.

{¶ 175} Nor did Judge Grendell promote public confidence in the judiciary through his conduct in open court in connection with the GoFundMe web page that community members had set up to help raise money to allow Hartman to retain counsel after the boys had been held in detention. We are particularly troubled by his threat to "claw back" money raised through that page and use it to reimburse the county for the boys' appointed counsel. We are not aware of any basis for such a "claw back," and Judge Grendell's comments at the hearing appear to have been motivated more by his own anger at the page's negative portrayal of him than by a legitimate concern for the welfare of the children.

{¶ 176} Thus, we conclude that the record supports a finding that Judge Grendell violated Jud.Cond.R. 1.2 in connection with the Glasier matter.

### iv. Jud.Cond.R. 2.9

{¶ 177} Jud.Cond.R. 2.9 generally prohibits a judge from engaging in ex parte communications except in limited circumstances. Among the exceptions are that a judge may make "an ex parte communication for scheduling, administrative, or emergency purposes, that does not address substantive matters or issues on the merits . . . provided the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication." Jud.Cond.R. 2.9(A)(1).

66

{¶ 178} The board made a single finding of a violation of Jud.Cond.R. 2.9(A). It did so in connection with Judge Grendell's handling of the June 1 post-detention hearing. Board Report at ¶ 143. The board stated that Judge Grendell conducted an "ex parte meeting" with the attorneys for the boys. It found that at the hearing, "[i]n blatant violation of Jud.Cond.R. 2.9(A)['s prohibition on ex parte communications, Judge Grendell] presented his biased version of the facts of the custody case to the two attorneys he had appointed to represent the boys in the unruly case." *Id.* at ¶ 136.

{¶ 179} We do not understand the board's conclusion that the hearing was ex parte. Both boys' attorneys were present, and because no formal charges had been filed there were no other parties to the case. While the board may believe that Judge Grendell was incorrect in his perception that Hartman was responsible for the boys' refusal to attend visitation with their father, Judge Grendell did not make an improper ex parte communication in conveying his assessment to the boys' attorneys.

{¶ 180} The only place in its report where the board made a finding of a Jud.Cond.R. 2.9 violation is in its conclusory paragraph listing rule violations arising out of the June 1 hearing. As part of its account of the GoFundMe web page, however, the board stated that Judge Grendell engaged in "yet another ex parte communication when he called [Hartman's attorney after the July 23 hearing] demanding to know why Hartman had not taken down the GoFundMe page." Board Report at ¶ 174. Thus, we also consider whether that communication constituted a violation of Jud.Cond.R. 2.9(A).

{¶ 181} Judge Grendell argues that the phone call was administrative in nature and provided neither party a procedural, substantive, or tactical advantage. He maintains that the purpose of the call was to check on why Hartman had not removed the boys' picture from the GoFundMe web page after her counsel had said at the hearing that Hartman would do so.

{¶ 182} We agree that the phone call did not provide a procedural, substantive, or tactical advantage to any party. Glasier was not disadvantaged by not being privy to the call. Nor is it clear that the communication concerned a substantive matter in the case. The call did not touch on any of the matters being litigated. And in making the call, Judge Grendell was ostensibly acting to protect the privacy of the juveniles. Perhaps Judge Grendell's call was motivated more by his dislike of the criticisms directed at him, as the board seemed to believe, than by his desire to protect the boys. But the focus of the rule is on whether the call concerned a substantive matter and whether it provided an advantage to either party.

{¶ 183} Based on the record before us, and considering the clear-and-convincing-evidence standard, we decline to find that the communication concerned a substantive matter in the case and constituted a willful breach of Jud.Cond.R. 2.9. *See* Gov.Jud.R. I(1) ("willful breach" of the Code of Judicial Conduct may be punished by judicial discipline). We caution, however, that simply because we do not find that the conduct meets the threshold for a disciplinary violation, does not mean that we approve of the conduct. By far the most prudent course would have been for Judge Grendell to avoid any question about the propriety of his conduct by engaging counsel for both parties in any conversation.

*v. Code of Judicial Conduct violations in the Glasier matter*

{¶ 184} Based on the foregoing, we conclude that Judge Grendell violated Jud.Cond.R. 1.2, 2.2, and 2.11 in connection with the Glasier matter.[8] We now

---

8. The board also found a violation of Prof.Cond.R. 8.4(d), which generally prohibits attorneys from "engag[ing] in conduct that is prejudicial to the administration of justice." Any violation of the Code of Judicial Conduct might be considered prejudicial to the administration of justice. The board did not, however, identify any specific conduct that violated Prof.Cond.R. 8.4(d) that was distinct from that encompassed by the other violations. Although in the past we have found violations of multiple rules for the same conduct, the better practice is to separately apply the disciplinary rules and give them independent force. Conclusory statements that the same conduct violated multiple rules does not give those rules the separate application they are due. And piling on general rule violations to expand the number of disciplinary charges for the same violation does not advance the ends of the disciplinary process. *See, e.g.*, *In re Discipline of Brussow*, 2012 UT 53, ¶ 1, fn. 1 (concluding that it would be unfair to punish an attorney for Utah's equivalent to Prof.Cond.R. 8.4

consider Judge Grendell's objections to the board's findings of aggravating and mitigating factors.

## IV. AGGRAVATING AND MITIGATING FACTORS

{¶ 185} When determining the appropriate sanction for a disciplinary violation, this court considers the ethical duty that was violated, the injury that resulted, the aggravating and mitigating factors set forth in Gov.Bar R. V(13), and precedent from similar cases. *Disciplinary Counsel v. Oldfield*, 2014-Ohio-2963, ¶ 17.

{¶ 186} Gov.Bar R. V(13)(B) sets forth aggravating factors that "may be considered in favor of recommending a more severe sanction," and Gov.Bar R. V(13)(C) sets forth mitigating factors that "may be considered in favor of recommending a less severe sanction." The board found six aggravating factors: (1) a dishonest or selfish motive, (2) multiple offenses, (3) a pattern of misconduct, (4) the submission of false statements during the disciplinary process, (5) harm to vulnerable victims, and (6) refusal to acknowledge the wrongful nature of his conduct. The board found applicable two mitigating factors: (1) no prior disciplinary record and (2) evidence of good character and reputation. But it discounted the character and reputation evidence, concluding that the many letters attesting to Judge Grendell's good character should be accorded little weight because few of the character witnesses were familiar with the charges against Judge Grendell. After weighing the aggravating and mitigating factors, the board

---

based solely on the violation of another rule); *In re Convisser*, 2010-NMSC-037, ¶ 32 ("piling on another rule violation that is only a more general means to condemn misconduct that specifically violated other rules would add little to the outcome of this proceeding"); *Iowa Supreme Court Attorney Disciplinary Bd. v. Netti*, 797 N.W.2d 591, 605 (Iowa 2011) (declining to find a violation of a more general prohibition after finding that attorney's conduct violated a specific prohibition in the rules); *In re Carpenter*, 2015 ND 111, ¶ 20 ("Unnecessary 'stacking' or 'piling on' of rule violations for the same conduct is discouraged."). Thus, because we believe the conduct encompassed by the board's Prof.Cond.R. 8.4(d) finding is encompassed within the violations that we have found, we find it unnecessary to make an additional finding of a violation of Prof.Cond.R. 8.4(d).

recommended that Judge Grendell be suspended from the practice of law for 18 months, with six months stayed. It also recommended that he complete eight hours of judicial-ethics education on the appropriate use of contempt powers.

{¶ 187} Judge Grendell objects that the board's recommendation is too harsh because it improperly analyzed the aggravating and mitigating factors. He asserts that the board made four errors in its identification of aggravating factors. First, he argues that disciplinary counsel failed to show that he had a dishonest or selfish motive because there was no evidence that he acted for personal advantage. Second, he argues that he did not engage in a pattern of misconduct or commit multiple offenses. Third, he argues that he did not intentionally submit false statements to disciplinary counsel. And fourth, he argues that he did acknowledge the wrongful nature of his conduct.

{¶ 188} Judge Grendell asserts that the board made two errors in its identification of mitigating factors. First, he argues that the board should have given more weight to his lack of disciplinary record. And second, he argues that the board should not have disregarded his many character letters.

### A. We Sustain Judge Grendell's Objection as to the Dishonest-or-Selfish-Motive Aggravating Factor

{¶ 189} Gov.Bar R. V(13)(B)(2) identifies as an aggravating factor "[a] dishonest or selfish motive." The board found this aggravating factor present in all three matters. Because we find no violations as to the Tea Party event and the legislative testimony, we consider only the Glasier matter.

{¶ 190} The board concluded that Judge Grendell acted with a selfish motive because his conduct was motivated by a desire to "succeed where other courts had failed" in reuniting the boys with their father. It found that Judge Grendell acted "[s]elfishly" in "us[ing] the unruly charges and detention as coercive tools to achieve his desired outcome."

70

**{¶ 191}** Words in Ohio's rules of court, such as the Rules for the Government of the Bar, are given their plain and ordinary meaning. *See In re T.A.*, 2022-Ohio-4173, ¶ 16. Selfishness is exemplified by conduct taken for one's personal advantage with disregard for the rights of others. *See Webster's Third New International Dictionary* (2002) (defining "selfish" as "seeking or concentrating on one's own advantage . . . without regard for others" and "performed to benefit oneself esp. in disregard of the welfare of others"); *see also Gaul*, 2023-Ohio-4751, at ¶ 79 (declining to find selfish motive as an aggravating factor because although the judge "committed numerous rule violations, there [was] no proof in the record that he engaged in misconduct for his personal advantage or that he was excessively or exclusively concerned with himself").

**{¶ 192}** In concluding that Judge Grendell acted with a selfish motive because he sought to succeed where others had failed, the board went well beyond the ordinary understanding of the term. Tracking the common meaning of the term, we don't normally think of someone as acting selfishly unless he materially benefits himself while consciously disregarding how his actions affect others. A person acts selfishly, for example, when he takes the last two slices of cake even though he knows someone else wants one.

**{¶ 193}** But here, the board concluded that Judge Grendell had a selfish motive simply because he wanted to succeed where others had failed. We typically don't think of such behavior as selfish; indeed, it is something we often commend. Were the Wright brothers selfish in their desire to be the first to reach the skies? Sir Edmund Hillary to be the first to summit Mount Everest? A teenager who wants to be the first in her family to graduate from high school?

**{¶ 194}** One can certainly take issue with some of the decisions that Judge Grendell made (as we do), but nothing in the record indicates that he acted for his own personal advantage. "We must be careful to not confuse the effects of misconduct with the motive for the misconduct." *Gaul*, 2023-Ohio-4751, at ¶ 79.

The easiest—and most self-serving—course for Judge Grendell would have been simply to decline to accept the transfer of the case at all or to abandon his efforts at reunification once it became clear how difficult it would be to accomplish that goal. Judge Grendell may have been stubborn, misguided, and even flat wrong in his handling of the case, but there is nothing to suggest that he acted with a selfish motive.

**{¶ 195}** In addition, the board found that Judge Grendell's motive was dishonest, opining that he "dishonestly claim[ed] he was acting in the children's best interest." But we find nothing in the record that supports such a finding. There is no evidence that Judge Grendell did not subjectively believe that he was acting in the boys' long-term best interests. Thus, we sustain Judge Grendell's objection as to the "dishonest or selfish motive" aggravating factor.

## B. We Sustain Judge Grendell's Objection as to the Pattern-of-Misconduct and Multiple-Offenses Aggravating Factors

**{¶ 196}** "A pattern of misconduct," Gov.Bar R. V(13)(B)(3), is an aggravating factor, as is "[m]ultiple offenses," Gov.Bar R. V(13)(B)(4). The board found that Judge Grendell committed multiple offenses because he committed "eleven rule violations involving three separate matters." In addition, the board found that Judge Grendell engaged in a pattern of misconduct because he committed multiple violations of the rules in each of the three matters. In light of our conclusion that Judge Grendell committed violations in a single matter, we sustain his objection as to the "pattern of misconduct" and "multiple offense" aggravating factors.

## C. We Sustain Judge Grendell's Objection as to the False-Evidence Aggravating Factor

**{¶ 197}** Gov.Bar R. V(13)(B)(6) identifies as an aggravating factor "[t]he submission of false evidence, false statements, or other deceptive practices during the disciplinary process." The board found this factor applicable, concluding that

Judge Grendell had submitted "patently false" statements about the June 1 post-detention proceedings. Specifically, the board pointed to three statements by Judge Grendell:

> Respondent falsely stated that he conducted a detention hearing following the release of the Glasier boys from their weekend detention and said that he had even moved up the time of the hearing to minimize their time in detention. In his response to Relator's notice of intent, he falsely claimed that the boys attended the detention hearing on June 1, 2020 along with their mother and their counsel. In his answer to the amended complaint, Respondent stated that "Respondent ordered the handcuffs removed as soon as the boys entered the courtroom."

(Citations to record omitted.) Board Report at ¶ 270.

{¶ 198} As to the first statement, the board found Judge Grendell's statement to be false because in its view, he did not hold a detention hearing with the boys present and instead met with the attorneys in the courtroom and then ordered the boys released from custody. The falsity of Judge Grendell's statement turns on whether one considers the session with the attorneys to be a "hearing." The session occurred in the courtroom and was recorded. Whether the session could properly be termed a "hearing" seems to us more one of semantics than a basis for a disciplinary violation.

{¶ 199} The other two statements do present inaccuracies. The boys and their mother were never in the courtroom, and consequently, Judge Grendell did not order the boys' handcuffs removed as soon as they entered the courtroom. Judge Grendell explains that the inaccuracy was unintentional, that the board was able to review the full videotape of the proceeding, and that any inaccuracy in his

recollection was not material to the disciplinary proceeding. He notes that he "has consistently provided detailed statements and testimony in response to [disciplinary counsel's] letter of inquiry, in his response to the probable cause complaint, in his answers, at his deposition, and during his direct and cross-examinations at the hearings." And he suggests that "given [his] multiple and highly detailed statements . . . about this matter over a four-year period, it would not be unusual and unexpected to find some differences or inconsistencies."

{¶ 200} We have reviewed the entire record in this case. Throughout, Judge Grendell has provided detailed responses to the board and disciplinary counsel. Considering the volume of responses, we cannot conclude that the two isolated statements were the type of deliberate misrepresentations made with an intent to deceive such that they should be considered an aggravating factor.

### D. We Sustain Judge Grendell's Objection as to the Refusal-to-Acknowledge-Wrongful-Conduct Aggravating Factor

{¶ 201} The board also found as an aggravating factor that Judge Grendell refused to acknowledge the wrongful nature of his conduct. In support of this finding, the board explained that Judge Grendell had maintained that he did not commit the charged violations. It acknowledged that a judge charged with a disciplinary violation has a right to defend himself, but it concluded that Judge Grendell's "claims that he did nothing wrong [were] untenable in light of his own testimony and the other evidence presented at the hearing." Judge Grendell objects, saying that his testimony during the disciplinary process demonstrates his remorse for detaining the boys.

{¶ 202} Gov.Bar R. V(13)(B)(7) identifies "[a] refusal to acknowledge wrongful nature of conduct" as an aggravating factor. At the same time, our rules provide for disciplinary matters to be handled in adversary proceedings. In an adversary proceeding, it is certainly appropriate for a respondent to mount a vigorous defense and to contest the charges against him.

{¶ 203} In regard to the detention of the boys, Judge Grendell testified:

[T]his has been a terrible experience. I wish I had other options that night [the boys were detained]. . . . I wish we could have done something different. But that night, that was my decision. And [the detention] was permitted by statute and permitted by law.

And . . . they weren't harmed. You know, I mean, not as harmed as much as I thought they would be [by being allowed to cut off contact with their father]. That was the thought process. There was no punishment.

{¶ 204} We are not convinced that Judge Grendell's posture during the proceedings amounted to anything more than defending his actions, something he was entitled to do. And indeed, we have ultimately agreed with many of Judge Grendell's legal arguments. This is not a case in which despite clear ethical violations, a judge has failed to acknowledge that he or she did anything wrong. Nor is it a case in which a judge has denied factual allegations despite strong evidence to the contrary. Rather, it is a case in which a judge has set forth nonfrivolous arguments in support of his legal determinations and discretionary decisions. We decline to adopt the board's findings as to this aggravating factor.

### E. Judge Grendell's Lack of Prior Disciplinary Record Is a Mitigating Factor

{¶ 205} "The absence of a prior disciplinary record" is a mitigating factor. Gov.Bar R. V(13)(C)(1). The Board Report notes with one line that Judge Grendell has no prior disciplinary record. Judge Grendell objects that the board should have given more weight to this factor. How much weight the board gave this factor is speculative, but we would add to the board's sparse description that Judge Grendell has been a licensed attorney in Ohio since 1978 and has been a judge since 2011.

The length of his service to Ohio adds to the mitigating weight of the absence of a disciplinary record.

### F. Judge Grendell's Character and Reputation Are Mitigating Factors

{¶ 206} "Character or reputation" is also a mitigating factor. Gov.Bar R. V(13)(C)(5). The board received almost 60 letters attesting to Judge Grendell's good character. The board found that the many letters established that Judge Grendell is respected as a jurist and member of his community. The board also noted that three character witnesses testified to his good reputation at the disciplinary hearing. The board, however, accorded little weight to the character testimony and letters because the board could not determine whether the witnesses and letter writers would have a different opinion of Judge Grendell's character if they were aware of the allegations against him.

{¶ 207} The board overly diminished the weight of these abundant testimonies to Judge Grendell's good character. A character witness's familiarity with the alleged violations is a point of consideration, but letters supporting Judge Grendell's character should not be disregarded merely because they fail to address the factual circumstances underlying the allegations. By including character or reputation as a mitigating factor, the rules contemplate that character and reputation will be considered separately from the misconduct that has been charged.

{¶ 208} Completely lacking from the Board Report as a mitigating factor are Judge Grendell's leadership roles in the judiciary. He has held roles in the Ohio Juvenile Judges Association, the Ohio Probate Judges Association, the National College of Probate Judges, and the Ohio Judicial Conference. He also is a veteran, with distinguished service in the United States Army Judge Advocate General Corps. And he started two educational programs in Geauga County: the Good Deeds program, which educates the community about probate, and Geauga Learn, which educates youth about agriculture, history, and government in Geauga County. These actions are laudable and have mitigating force.

{¶ 209} All told, there is a sizeable amount of character evidence that the board did not address in its report that should properly be considered as mitigating evidence.

## V. THE APPROPRIATE SANCTION

{¶ 210} The board recommended an 18-month suspension with six months stayed. Judge Grendell argues that this sanction is too severe and does not comport with past disciplinary decisions by this court.

{¶ 211} We note at the outset that a departure from the board's recommended sanction is warranted by our previous determinations regarding Judge Grendell's other objections. While the board recommended a finding of violations across three separate matters, we have found violations in a single matter. The board found six aggravating factors, but we determine that only one, Gov.Bar R. V(13)(B)(8) ("[t]he vulnerability of and resulting harm to victims of the misconduct") applies. The board found two mitigating factors, Gov.Bar R. V(13)(C)(1) (absence of a prior disciplinary record) and (5) ("[c]haracter or reputation"), but failed to accord them their appropriate weight.

{¶ 212} In determining appropriate sanctions, we consider, among other things, "the sanctions imposed in similar cases." *Disciplinary Counsel v. Berry*, 2021-Ohio-3864, ¶ 14. No two disciplinary cases present identical facts, so there will often be considerable debate as to what is a similar case. Here, the facts that we find most salient in identifying comparable cases are (1) that Judge Grendell's violation resulted in the improper detention of two juveniles and (2) that Judge Grendell committed disciplinary violations in a single case.

{¶ 213} In recommending a suspension of 18 months with six months stayed, the board recommended the same sanction that we imposed in *Hoover*, 2024-Ohio-4608. Similar to this case, two of the disciplinary violations in *Hoover* involved wrongful confinements. One defendant was unlawfully jailed for seven

days; the other for four days. *Id.* at ¶ 213. But *Hoover* dealt with a much broader pattern of misconduct, spanning across 16 separate matters. *Id.* at ¶ 186.

{¶ 214} We also imposed an 18-month suspension with six months stayed in *Disciplinary Counsel v. Parker*, 2007-Ohio-5635, for conduct that included a wrongful detention order. *Parker* at ¶ 8, 130. But *Parker*, too, involved a much broader pattern of misconduct, encompassing more than 12 separate matters. *See id.* at ¶ 7-8, 10, 13, 19, 23, 37, 42, 49-53.

{¶ 215} The same goes for *Disciplinary Counsel v. Medley*, 2004-Ohio-6402, another case in which we imposed an 18-month suspension with six months stayed. *Medley* at ¶ 43. In *Medley*, the judge caused a "significant number" of people to be incarcerated through his systematic use of improper debt-collection procedures in small-claims court and committed 16 disciplinary-rule violations. *See id.* at ¶ 10, 13, 20, 26, 32, 37.

{¶ 216} A case that involved judicial misconduct in the context of the incarceration of juveniles is *Disciplinary Counsel v. Karto*, 2002-Ohio-61. The charges of judicial misconduct in *Karto* spanned across multiple cases. *See Karto* at ¶ 2-10. One of the cases involved two juveniles who were brothers. *Id.* at ¶ 5-6. The judge improperly sentenced one of the juveniles to serve 90 days in a detention center, even though the applicable statute did not provide for incarceration on the offenses charged. *Id*. at ¶ 5; Board Report in *Karto* (Supreme Court case No. 2001-0877) at 6. The "sole explanation" that the judge presented for the illegal sentence was that he had used an outdated rule book because the newer version had been stolen. *Karto* at ¶ 25. We also concluded that the judge engaged in misconduct when the juvenile, along with his brother, was brought before the judge on delinquency charges. *Id.* at ¶ 6-7, 26. The boys told the judge they were represented by counsel, but the judge conducted a detention hearing without counsel present, directing the boys to cross-examine the State's witness. *Id.* at ¶ 7. Following the hearing, the judge ordered that the boys be confined in the juvenile detention center

until an adjudicatory hearing could be held. *Id.* The judge also engaged in multiple improper ex parte communications regarding the juveniles. *Id.* at ¶ 6, 26. In addition to the misconduct involving the two juveniles, we found disciplinary violations in three other matters, all involving abuse of the judge's contempt powers. *Id.* at ¶ 18-19, 28. For this series of violations, we imposed a six-month suspension. *Id.* at ¶ 33.

{¶ 217} We imposed the same sanction in *Disciplinary Counsel v. Bachman*, 2020-Ohio-6732, a case, like the one at bar, that involved improper detention in a single case. *Id.* at ¶ 2, 37. In *Bachman*, a woman caused a disruption in the courthouse hallway, which Magistrate Bachman heard from the bench. *Id.* at ¶ 6. We explained what happened next:

> [The video] shows Bachman exiting the courtroom in his robe and running down the hallway in pursuit of K.J. He accosts her at the elevators and returns her to his courtroom. Once there, Bachman walks her through the crowded courtroom with his hand on her shoulder, places her in a seat in his jury box, and orders her not to move just before summoning the sheriff. Multiple sheriff's deputies soon arrive, and Bachman orders them to take K.J. into custody and to jail her for three days for contempt, causing her to cry and attempt to leave the jury box.
>
> The next 20 minutes of the video are difficult to watch. While K.J. resists being arrested and pleads with Bachman to explain why she is being jailed for three days, she is physically subdued by two deputies, threatened with being tased, and ultimately dragged from the jury box by several deputies. Bachman's only response is to increase her jail sentence to ten days. Not only is the chain of events set in motion by Bachman's

misconduct physically and emotionally harmful to K.J., the incident exposed the sheriff's deputies and other court personnel to harm from a violent and unnecessary arrest on full display in front of a courtroom full of people who have no other choice but to sit silently and witness such a disturbing sight. Bachman then congratulates a deputy on an award the deputy had recently received and resumes the proceeding as if nothing out of the ordinary has just transpired. Meanwhile, the video footage shows, while K.J. continues protesting her arrest, she is dragged, yanked, pinned to a wall, and handcuffed to a chair. Before the video ends, over 20 deputies and members of the court staff are involved in jailing K.J.—all because of a scream of frustration in the hallway that lasted one second.

*Id.* at ¶ 29-30. The woman was incarcerated for two days of the ten-day sentence that Magistrate Bachman imposed before the presiding judge intervened and ordered her released from jail. *Id.* at ¶ 11.

{¶ 218} Like Judge Grendell, Magistrate Bachman caused harm to a vulnerable victim but had no prior discipline and presented evidence of his good character and reputation. *Id.* at ¶ 14. In *Bachman*, however, we found it significant that he refused to acknowledge any responsibility, noting that he was "utter[ly] indifferen[t] to the harm he caused [the victim] and the integrity of the judiciary." *Id.* at ¶ 31.

{¶ 219} Based on other cases involving judicial officers who committed misconduct in connection with a single matter, the board recommended that Magistrate Bachman receive a fully stayed suspension of six months. *Id.* at ¶ 3, 17. We determined, however, that a more severe sanction was "necessary to send a strong message to members of the judiciary, to deter similar violations in the future, and to make crystal clear to the public that this type of judicial misconduct will not

be tolerated." *Bachman* at ¶ 36. We imposed an actual six-month suspension on Magistrate Bachman. *Id.* at ¶ 37.

{¶ 220} Following *Bachman*, in *Disciplinary Counsel v. Repp*, 2021-Ohio-3923, we imposed a 12-month suspension with no stay on a judge who had wrongfully incarcerated someone who was not even a party to a proceeding before the judge. *Id.* at ¶ 2, 33. The judge sentenced a courtroom spectator to ten days in jail after the spectator had refused the judge's demand that she submit to a drug test. *Id.* at ¶ 13-14. In imposing the one-year suspension, we concluded that Judge Repp's conduct was "substantially more egregious" than the conduct in *Bachman*. *Id.* at ¶ 32. The spectator "did *absolutely nothing* to justify [Judge] Repp's attention in the courtroom—let alone his order that she be drug tested." (Emphasis in original.) *Id.* at ¶ 30. Further, she was not the only victim of Judge Repp's misconduct that day. He also directed highly inappropriate and prejudicial comments toward her boyfriend, who was a defendant who appeared by video from the Seneca County jail. *Id.* at ¶ 10-12.

{¶ 221} Judge Grendell argues that *Bachman* is an outlier, noting that in other cases we have imposed fully stayed suspensions for instances of abuse of judicial power that occur within a single proceeding. In *Disciplinary Counsel v. Hoague*, 2000-Ohio-340, we disciplined a judge who had been found guilty of misdemeanor coercion for an abuse of judicial power. *Id.* at ¶ 6, 9. After observing an erratic driver on the highway, the judge tracked down the identity of the car's owner and wrote the owner a letter. *Id.* at ¶ 1-2. The letter stated that a complaint had been filed with the highway patrol about the driver's reckless driving and the matter was under investigation. *Id.* at ¶ 2. The letter demanded that the owner contact the judge's office to avoid "further legal action being taken against [her]" and warned that if she failed to do so, the judge would "authorize the filing of any appropriate criminal and/or traffic charges, the seizure and impoundment of [her] motor vehicle and the issuance of a warrant for [her] arrest." *Id.* When the driver

responded to the letter by appearing in the courtroom, the judge "conducted an arrogant inquisition, finally threatening to contact [her] employer about [her] driving habits, a threat which he apparently later attempted to carry out." *Id.* at ¶ 13. We suspended the judge for six months but stayed the entire suspension. *Id.* at ¶ 15.

{¶ 222} In *Disciplinary Counsel v. Gaul*, 2010-Ohio-4831, we also imposed a six-month stayed suspension for a serious but "isolated" instance of misconduct. *Id.* at ¶ 77, 80. In that case, a judge had become upset because an elderly victim did not appear for a criminal prosecution. *Id.* at ¶ 4-8. To locate the witness, the judge instructed his bailiff to issue an amber alert and inform the media of the alert. *Id.* at ¶ 14. The media came to the judge's courtroom, but the alert was not ultimately issued because courtroom personnel learned that the witness had been found in a dialysis facility. *Id.* at ¶ 15-16, 57. After the media arrived in the courtroom, the judge directed "highly prejudicial and unnecessary comments . . . toward the defendant." *Id.* at ¶ 55.

{¶ 223} In *Disciplinary Counsel v. Elum*, 2016-Ohio-8256, we sanctioned a judge who interjected himself in a landlord-tenant dispute that was not on his docket. *Id.* at ¶ 2, 7. In multiple communications, the judge attempted to convince the landlord, who said she felt intimidated and bullied, to accept late payment from the tenant. *Id.* at ¶ 5-6. We adopted the board's recommendation of a one-year stayed suspension. *Id.* at ¶ 16. We noted that in other cases involving "an isolated incident of judicial misconduct," a lighter sanction was imposed. *Id*. at ¶ 14, citing *Hoague* and *Gaul*, 2010-Ohio-4831. But because this was Judge Elum's second disciplinary violation, we determined a stayed one-year sentence was appropriate. *Id.* at ¶ 14-16.

{¶ 224} Other cases follow a similar pattern of imposing a sanction that falls short of an actual suspension from the practice of law for judicial misconduct that occurs within the context of the handling of a single case. *See, e.g.*, *Disciplinary*

*Counsel v. Porzio*, 2020-Ohio-1569 (stayed six-month suspension imposed on magistrate for ex parte communications, profanity, and improper comments about a party's religion and ethnicity); *Disciplinary Counsel v. O'Diam*, 2022-Ohio-1370 (stayed six-month suspension imposed on judge who after estate beneficiary questioned why the judge's daughter was allowed to appear in front of him, summoned estate beneficiary to court and interrogated him under oath in a disparaging manner and then allowed his daughter to continue the interrogation); *Disciplinary Counsel v. McCormack*, 2012-Ohio-4309 (stayed one-year suspension imposed on magistrate who committed multiple violations over the course of four hearings in a single modification-of-child-support matter); *Disciplinary Counsel v. Medley*, 2001-Ohio-1592 (public reprimand imposed on judge for not recusing from case involving defendant who called the judge after being arrested and whom the judge picked up from the police station after booking). We have also sometimes imposed stayed suspensions for instances of judicial misconduct that spanned across multiple cases. *See Oldfield*, 2014-Ohio-2963 (public reprimand imposed on judge for not recusing from multiple cases involving an attorney with whom the judge was temporarily living and for whom the judge was a potential witness in a criminal prosecution); *Disciplinary Counsel v. Elum*, 2012-Ohio-4700 (stayed six-month suspension imposed on judge for misconduct in two cases involving profanity, interceding in an internal police investigation, and publicly disparaging the local police chief).

{¶ 225} A few conclusions are evident from the aforementioned precedent. First, the board's recommended sanction of 18 months with six months stayed—which is the same sanction imposed for violations that spanned multiple matters in *Hoover*, *Medley*, 2004-Ohio-6402, and *Parker*—is harsher than warranted in this case, which involves violations in a single matter. Second, our precedent in cases involving misconduct that occurs within a single matter would generally suggest that a stayed suspension is appropriate.

{¶ 226} On the other hand, *Bachman* and *Repp* make clear that even in matters involving misconduct within a single proceeding, an actual suspension sometimes may be warranted. Comparing this case to *Bachman*, we note that while Judge Grendell's actions were motivated by a desire to achieve what he believed to be a proper result, Magistrate Bachman's actions appear to have been motivated by little more than his own anger. And Magistrate Bachman not only inappropriately sent a person to jail on contempt charges, he also chased her in a court hallway and physically placed her in the jury box. But weighing in the other direction is that while Magistrate Bachman improperly detained one adult, Judge Grendell improperly detained two vulnerable children. Further, while Magistrate Bachman's outburst arose from a sudden fit of anger, Judge Grendell's decision to incarcerate the boys and leave them in detention over the weekend involved considerably more calculation and time for reflection.

{¶ 227} The punishment meted out in *Bachman* reflects the seriousness with which we treat misconduct that results in wrongful detention, particularly when that wrongful detention is ordered immediately and summarily, without any recourse to timely relief through the appellate process. While we determine it is appropriate to impose the same actual suspension as we imposed in *Bachman*, we also determine that this case warrants a somewhat more severe punishment because it involved the unjustified incarceration of two children. Thus, we conclude that Judge Grendell should be suspended from the practice of law for 18 months with 12 months stayed.

## VI. CONCLUSION

{¶ 228} Timothy J. Grendell is suspended from the practice of law in Ohio for 18 months with 12 months stayed on the condition that he commit no further misconduct. If Judge Grendell fails to comply with the condition of the stay, the stay will be lifted and he will serve the entire 18-month suspension. Pursuant to Gov.Jud.R. III(7)(A), Judge Grendell is immediately suspended from judicial office

without pay for the duration of his disciplinary suspension. Costs are taxed to Judge Grendell.

Judgment accordingly.

———————————

**FISCHER, J., joined by EDELSTEIN, J., concurring in part and dissenting in part.**

{¶ 229} I concur in the court's conclusions that respondent, Judge Timothy Grendell, did not violate the Code of Judicial Conduct by his actions surrounding the Tea Party event set out in Count 3. However, regarding Count 4, which involved Judge Grendell's testimony before a state legislative committee, I must dissent from the court's conclusion that Judge Grendell violated Jud.Cond.R. 3.2. Instead, I would find that Judge Grendell did not violate that rule based on its plain language. Therefore, unlike the majority, I would not reach the constitutional issue concerning that rule.

{¶ 230} Finally, regarding Count 1, the Glasier matter, I dissent from the court's conclusion that Judge Grendell did not violate Prof.Cond.R. 8.4(d). It is clear that by wrongfully incarcerating two juveniles in that matter, Judge Grendell engaged in conduct that was prejudicial to the administration of justice. However, I agree with the court's conclusion that his conduct also constituted a violation of Jud.Cond.R. 1.2, 2.2, and 2.11, and I concur in the sanction imposed. Therefore, I concur in part and dissent in part.

## I. THE LEGISLATIVE TESTIMONY

{¶ 231} Regarding Count 4, the Board of Professional Conduct found that Judge Grendell violated Jud.Cond.R. 3.2 and Jud.Cond.R. 1.3 when he voluntarily testified before a legislative committee on House Bill 624 ("H.B. 624"), which was sponsored by Representative Diane Grendell, Judge Grendell's wife, and which would have required the government to release certain statistics related to COVID-19. I concur in this court's conclusion that Judge Grendell did not violate

85

Jud.Cond.R. 1.3. However, I dissent from its conclusion that he violated Jud.Cond.R. 3.2. The court declines to discipline Judge Grendell for violating Jud.Cond.R. 3.2 because it holds that Jud.Cond.R. 3.2 is an unconstitutional content-based speech restriction in violation of the First Amendment. Because I would find that Judge Grendell did not violate Jud.Cond.R. 3.2, I would not reach the constitutional question.

{¶ 232} Jud.Cond.R. 3.2 states:

> A judge shall not appear voluntarily at a public hearing before, or otherwise consult with, an executive or a legislative body or official, except as follows:
>
> (A) In connection with matters concerning the law, the legal system, or the administration of justice;
>
> (B) In connection with matters about which the judge acquired knowledge or expertise in the course of the judge's judicial duties;
>
> (C) When the judge is acting pro se in a matter involving the judge's legal or economic interests, or when the judge is acting in a fiduciary capacity.

Therefore, Jud.Cond.R. 3.2(A) allows judges to voluntarily testify at public hearings before executive or legislative bodies if their testimony is "[i]n connection with matters concerning the law." As defined by the Code of Judicial Conduct, "law" means "court rules, including [the Code of Judicial Conduct] and the Ohio Rules of Professional Conduct, *statutes*, constitutional provisions, and decisional law." (Emphasis added.) Code of Judicial Conduct, Terminology. The definition even cites Jud.Cond.R. 3.2 as one of the rules to which it applies. In other words, Jud.Cond.R. 3.2 expressly *allows* judges to voluntarily provide testimony "[i]n

connection with matters concerning" statutes.

{¶ 233} Judge Grendell's entire testimony was provided in support of H.B. 624, a bill that, if passed, would have become statutory law. Thus, it was clearly testimony that was provided "[i]n connection with matters concerning the law," as that term is defined in the Code of Judicial Conduct. Therefore, Judge Grendell did not violate Jud.Cond.R. 3.2.

{¶ 234} And because Judge Grendell did not violate Jud.Cond.R. 3.2, this court need not, and indeed should not, consider Judge Grendell's arguments regarding the constitutionality of Jud.Cond.R. 3.2. Under the constitutional-avoidance principle, "courts should not decide constitutional questions unless it is absolutely necessary to do so." *Epcon Communities Franchising, L.L.C. v. Wilcox Dev. Group, L.L.C.*, 2024-Ohio-4989, ¶ 17; *Ashland Global Holdings, Inc. v. SuperAsh Remainderman, Ltd. Partnership*, 2025-Ohio-2835, ¶ 34, quoting *Epcon* at ¶ 19 ("Under constitutional-avoidance considerations, 'we should not be deciding constitutional questions unless it is necessary to do so.'"); *State v. Talty*, 2004-Ohio-4888, ¶ 9 ("It is well settled that this court will not reach constitutional issues unless absolutely necessary."). And in this case, it is not necessary or advisable to reach the constitutional question because the matter can be resolved by merely applying the plain language of Jud.Cond.R. 3.2 to the facts. "It is a long-standing principle that '[c]onstitutional judgments . . . are justified only out of the necessity of adjudicating rights in particular cases,'" *Epcon* at ¶ 17, quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973), and the constitutional issue need not be decided to adjudicate the rights in this case. Therefore, I would adhere to this court's long-standing principle of constitutional avoidance and avoid addressing a constitutional question that it is unnecessary to resolve.

## II. THE GLASIER MATTER

{¶ 235} Regarding Count 1, the Glasier matter, I dissent from the court's conclusion that Judge Grendell did not violate Prof.Cond.R. 8.4(d). Prof.Cond.R.

8.4(d) says, "It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." It is clear in this case that Judge Grendell engaged in conduct that was prejudicial to the administration of justice.

{¶ 236} Judge Grendell incarcerated two juveniles without a sufficient legal basis to do so. In doing so, he violated Juv.R. 7(A), which states that a child who is taken into custody "shall not be placed in detention . . . prior to final disposition" except in limited circumstances. By not allowing the juveniles to contact their mother, he also violated Juv.R. 7(J), which states that "[a] child may telephone the child's parents and attorney immediately after being admitted to a shelter or detention facility and at reasonable times thereafter" and that a parent may visit "at reasonable visiting hours." The Board of Professional Conduct found that Judge Grendell's "claim that his order to detain the boys was in their best interest [was] patently facetious, contrary to law, and apparently motivated by his determination to 'not fail like the other courts did.'" Board Report, ¶ 120, quoting Judge Grendell's statement to the parties in the Glasier matter (the parents of the juveniles) at an April 20, 2020 hearing. The wrongful incarceration of two juveniles on "trumped-up charges," majority opinion, ¶ 172, clearly is prejudicial to the administration of justice. If such actions do not constitute a violation of Prof.Cond.R. 8.4(d), then it is hard to imagine what does.

{¶ 237} The majority opinion says that we should not find violations of multiple rules for the same conduct because each rule should be given a "separate application" and "piling on general rule violations to expand the number of disciplinary charges for the same violation does not advance the ends of the disciplinary process." *Id.* at ¶ 184, fn. 8. The implication of the majority opinion is that Prof.Cond.R. 8.4(d) cannot be enforced alongside another rule. In the past, this court has not shied away from finding a violation of Prof.Cond.R. 8.4(d) simply because the respondent's conduct also violated another rule. For example, in *Disciplinary Counsel v. Hoover*, 2024-Ohio-4608, we found that the respondent's

conduct in using demeaning language toward a person who failed to pay a fine violated both Jud.Cond.R. 1.2 and Prof.Cond.R. 8.4(d). *Id.* at ¶ 32. And in *Disciplinary Counsel v. Gaul*, 2023-Ohio-4751, which is cited several times in the majority opinion in this case, we found that the respondent had committed four violations of Prof.Cond.R. 8.4(d), and we found that each violation was accompanied by a violation of Jud.Cond.R. 1.2 as well as a host of other rule violations, *see id.* at ¶ 18, 22, 58, 69.

{¶ 238} Judge Grendell's actions in the Glasier matter clearly violated Prof.Cond.R. 8.4(d), and I will not ignore those violations simply because his conduct also violated Jud.Cond.R. 1.2, 2.2, and 2.11.

### III. CONCLUSION

{¶ 239} I concur in the court's conclusions regarding Count 3. However, I dissent from the court's conclusion that Judge Grendell's conduct related to Count 4 violated Jud.Cond.R. 3.2, so, under the principle of constitutional avoidance, I would not reach the constitutional issue concerning that rule. Regarding Count 1, I concur in the court's conclusion that Judge Grendell violated Jud.Cond.R. 1.2, 2.2, and 2.11; however, I would also find that he violated Prof.Cond.R. 8.4(d). Nevertheless, I concur in the sanction imposed by the court. Accordingly, I concur in part and dissent in part.

_____

Joseph M. Caligiuri, Disciplinary Counsel, and Martha S. Asseff, Assistant Disciplinary Counsel, for relator.

Roetzel & Andress, L.P.A., and Stephen W. Funk, for respondent.

_____